UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PERFORMANCE TRANS., INC., and UTICA MUTUAL INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL STAR INDEMNITY COMPANY, <br><br> Defendant. | CIVIL ACTION NO. _____ |

## COMPLAINT

The plaintiffs, Performance Trans., Inc. ("PTI") and Utica Mutual Insurance Company

("Utica"), by way of complaint against defendant General Star Indemnity Company ("General

Star"), state and allege as follows.

## INTRODUCTION

This is an action against General Star for breach of its obligations under its insurance

contract, and for unfair and deceptive trade practices.  General Star wrongfully has disclaimed

coverage under its excess liability policy for losses arising out of a February 19, 2019 accident in

which a tanker-truck insured by General Star overturned, spilling approximately 4,300 gallons of

gasoline, diesel fuel, and dyed diesel fuel onto the roadway and ultimately into a nearby

reservoir.  General Star's insured, PTI, has been charged with responsibility for the

environmental cleanup, which has been ongoing since the accident and is currently at a critical

stage.  Because PTI's primary coverage has been exhausted, General Star's wrongful disclaimer

of coverage presents an immediate risk of harm to PTI, and also to the general public, as General

Star's refusal to pay for the ongoing cleanup may cause the Licensed Site Provider ("LSP") to delay, slow down, or even cease remediation activities.  PTI therefore seeks immediate relief from this Court, in the form of a declaration that General Star is obligated to indemnify PTI for the losses arising out of the accident, in excess of the limits of the underlying policy and up to the $5,000,000 limits of liability of General Star's excess policy.

The plaintiffs also seek relief against General Star for breach of contract and for unfair and deceptive trade practices, as set forth in more detail below.

## PARTIES

1.      Plaintiff Performance Trans., Inc. ("PTI") is a Massachusetts corporation with a principal place of business at 70 Benson Street, Fitchburg, MA 01420.

2.      Plaintiff Utica Mutual Insurance Company ("Utica") is a New York corporation with a principal place of business in New Hartford, New York.

3.      Defendant General Star Indemnity Company ("General Star") is a Connecticut corporation with a principal place of business at 120 Long Ridge Road, Stamford, CT 06902.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because it is brought in the district in which a substantial part of the events or events giving rise to the action arose, in that General Star issued the excess policy to PTI in Fitchburg, Worcester County, Massachusetts, and refused to indemnify PTI in the same place.

FACTS

*General Star's Insurance Contract*

6.      PTI is a transportation company located in Fitchburg, Massachusetts.   The company hauls various commodities, including petroleum products.

7.      General Star issued to PTI an excess liability insurance policy, policy number IXG927683A, for the policy period March 1, 2018 to March 1, 2019 ("the Excess Policy").   The Excess Policy provided an aggregate limit of $5,000,000.   A copy of the Excess Policy is attached at **Exhibit A**.   This policy was a renewal of the previous year's excess policy.

8.      The Excess Policy provided that General Star would indemnify PTI "for **ultimate net loss** in excess of the total of the limits of **underlying insurance** that is covered by both the **controlling underlying policy** and this policy]." Id. at 4 (emphasis in original).

9.      The Excess Policy contained a "Special Hazards and Fluids Limitation Endorsement," which provided, in relevant part:

> This policy does not apply to **ultimate net loss** or **costs** from any **event** arising out of, contributed by [sic] or relating to any Special Hazard described in this endorsement and resulting from the ownership, maintenance or use of any auto.
>
> Special Hazards:
>
> [ . . . ]
>
> **C. Drilling Fluids Unloading Hazard**
>
> However, this exclusion does not apply to an **event** arising out of the unloading of **drilling fluids** from an auto covered by this policy and covered by the **controlling underlying insurance** for the total limits of the **underlying insurance**, if the unloading of **drilling fluids** resulted directly from any of the following:
>
> [ . . . ]
>
> 2. Upset or overturn of such auto; [or]

3

>3. A collision between such auto being used in your business and another object;
>
>[ . . . ]

Id. at 27 (emphasis in original).

10.     The drilling fluids endorsement defined a "drilling fluids unloading hazard" as "the unloading of **drilling fluids** from any auto, mobile equipment, machinery or equipment, whether unloading is the result of movement of property by a mechanical device, an accident, a **spill** or otherwise." Id. at 28 (emphasis in original).

11.     The drilling fluids endorsement defined "drilling fluids" as follows:

>[L]iquids which are used in or result from oil or gas drilling, extraction or recovery operations, regardless if the liquids contain gases, chemicals, solids, additives or proppants. Such liquids include, but are not limited to, flowback water, brine water, hydraulic fracturing fluids, lubricants or slippery water. Drinking quality water does not fall within this definition.

Id. at 27.

12.     The drilling fluids endorsement defined "spill" as "a discharge, dispersal, release or escape of **drilling fluids**." Id. at 28 (emphasis in original).

*The Accident*

13.     On the morning of February 19, 2019, a tanker-truck insured under the Excess Policy was operating on Route 116, also known as Titicus Road, in North Salem, New York.

14.     At approximately 8:06 AM, the tanker-truck drove off the road and overturned ("the Accident").

15.     As a result of the Accident, approximately 4,300 gallons of gasoline, diesel fuel, and dyed diesel fuel were released into the roadway and adjacent reservoir.

16.     The New York State Department of Environmental Conservation ("NYSDEC")

was promptly notified of the Accident.  PTI undertook emergency response actions at the site at

the direction of NYSDEC, and continues to work with NYSDEC to clean up the spill.

17.     PTI notified its primary commercial automobile carrier, Commerce Insurance

Company ("Commerce"), of the Accident.  Commerce promptly acknowledged its duty to

indemnify PTI up to the $1,000,000 limit of its policy.

*General Star's Wrongful Refusal to Indemnify*

18.     On March 13, 2019, when it became apparent that the cleanup and remediation

costs from the Accident would exceed the $1,000,000 limit of the Commerce policy, PTI notified

General Star of the Accident and resulting losses and sought coverage under the Excess Policy.

19.     By letter dated March 14, 2019, General Star disclaimed any duty to indemnify

PTI for the costs of the cleanup and remediation from the Accident.

20.     After General Star disclaimed coverage, PTI notified its insurance agent,

Insurance Marketing Agencies, Inc. ("IMA"), of the disclaimer of coverage.

21.     By letter dated April 5, 2019, IMA made a further demand on General Star to

acknowledge coverage for the Accident, specifically directing General Star to the drilling fluids

endorsement.

22.     By letter dated April 8, 2019, General Star reiterated its disclaimer of coverage,

asserting (without any analysis of the policy language) that the circumstances of the Accident did

not meet the definitions of "drilling fluids" or "drilling fluids unloading hazard."  A copy of

General Star's April 8, 2019 letter is attached at **Exhibit B**.

23.     Following this second disclaimer by General Star, IMA's liability insurer, Utica,

retained counsel.  By letter dated May 9, 2019, Utica's counsel made a further demand for

coverage upon General Star, pointing out that the circumstances of the Accident fell directly

within the definitions of "drillings fluids" and "drilling fluids unloading hazard," and therefore General Star owed PTI a duty of indemnification.

24.      Specifically, the endorsement defines "drilling fluids" as "liquids which are **used in** or **result from** oil or gas drilling, extraction or recovery operations."   **Exhibit B** at 27 (emphasis added).

25.      As Utica's counsel pointed out in her letter, gasoline and diesel fuel are both **used in** oil and gas drilling, and **result from** oil and gas drilling.   See **Exhibit B**.

26.      These liquids therefore fall within the definition of "drilling fluids" as defined in the Excess Policy.

27.      Moreover, the Accident involved a spill of gasoline and diesel fuel from a covered auto, thereby constituting a "drilling fluids unloading hazard" as defined in the Excess Policy. See **Exhibit B**.

28.      In response to Utica's May 9, 2019 letter, General Star retained coverage counsel.

29.      By letter dated May 23, 2019, General Star, for the third time, disclaimed coverage.  A copy of General Star's May 23, 2019 letter is attached at **Exhibit C**.  General Star reiterated its position that the drilling fluids endorsement did not apply, but went on to say that even if the endorsement did apply, it did not apply, due to the presence of a pollution exclusion on the policy.  See id.  In support of this position, General Star imagined that there could be a scenario where there was a spill of drilling fluids from an overturned vehicle that did not involve "pollutants."  Id.

30.      General Star nevertheless requested certain information concerning the Accident and the ongoing remediation, including an estimate as to future costs to be incurred, all of which was provided to General Star.

6

31.     On June 18, 2019, Utica's counsel sent a further letter to General Star, responding to General Star's coverage position and making a demand on General Star under M. G. L. c. 93A.

32.     As of the date of the filing of this Complaint, General Star has refused to acknowledge its duty to indemnify PTI under the Excess Policy for the losses resulting from the Accident.

33.     The $1,000,000 limits of the Commerce underlying policy now have been exhausted.

34.     The remediation efforts are ongoing, and are expected to cost at least an additional $1,000,000.

35.      In light of General Star's continuing refusal to honor its indemnity obligation under the Excess Policy, IMA, as PTI's insurance agent, has agreed to work with PTI to ensure that the remediation remains on track.

36.     As part of that effort, Utica, as IMA's insurer, agreed to reimburse PTI for payments made in connection with the remediation effort, up to a monetary cap, in excess of the amounts paid out by Commerce under its primary policy.

37.     PTI has assigned to Utica its rights against General Star, including its rights under M. G. L. c. 93A, to the extent of the amounts Utica has reimbursed to PTI for payments made in connection with the remediation.

COUNT I
DECLARATORY JUDGMENT
PTI v. GENERAL STAR INDEMNITY COMPANY

38.     The plaintiffs repeat and reallege the allegations contained in paragraphs 1-37.

39.     An actual controversy exists between PTI and General Star as to whether or not

7

General Star is obligated to indemnify PTI for losses resulting from the Accident in excess of the $1,000,000 underlying limit.

40.     This Court should declare that General Star has a duty under the Excess Policy to indemnify PTI for losses resulting from the Accident, up to the $5,000,000 limit of the Excess Policy.

COUNT II
BREACH OF CONTRACT
PTI and UTICA, AS ASSIGNEE v. GENERAL STAR INDEMNITY COMPANY

41.     The plaintiffs repeat and reallege the allegations contained in paragraphs 1-40.

42.     General Star's failure and refusal to acknowledge its duty to indemnify PTI for losses resulting from the Accident constitutes a breach of the Excess Policy.

43.     General Star's breach of the Excess Policy has caused and will cause damage to PTI.

44.     PTI  is entitled to recover from General Star all of the losses it has incurred and will incur in connection with the Accident, up to the $5,000,000 limit of the Excess Policy, plus interest at the statutory rate of 12% from the date of the breach, plus all of the fees and costs PTI has incurred and will incur in establishing General Star's duty to indemnify.

45.     Utica, as a partial assignee of PTI's rights against General Star, is entitled to recover from General Star all of the amounts it has reimbursed to PTI for remediation costs in connection with the Accident, plus interest at the statutory rate of 12% from the date of the breach, plus all of the fees and costs Utica has incurred and will incur in establishing General Star's duty to indemnify.

<u>COUNT III</u>
G. L. c. 93A, § 11
PTI and UTICA, AS ASSIGNEE  v. GENERAL STAR INDEMNITY COMPANY

46.    The plaintiffs repeat and reallege the allegations contained in paragraphs 1-45.

47.    General Star is an entity engaged in the business of insurance.

48.    PTI is an entity engaged in the business of transportation services.

49.    In General Star's dealings with PTI, which is located in Massachusetts, General Star engaged in unfair or deceptive acts or practices in violation of M. G. L. c. 93A by, *inter alia*, failing to indemnify PTI under the Excess Policy, failing to provide a reasonable explanation for denying coverage under the Excess Policy, ignoring or misstating the pertinent language of the Policy in relaying its coverage determinations, and failing to effectuate a prompt, fair, and equitable settlement of PTI's claim even though General Star's liability is reasonably clear.

50.    General Star's violations of M. G. L. c. 93A have caused and will continue to cause harm to PTI, entitling plaintiffs to an award of actual damages, plus attorneys' fees.

51.    General Star's conduct in disclaiming, and continuing to disclaim, its duty to indemnify PTI under the Excess Policy has been knowing and willful, entitling plaintiffs to an award of multiple damages.

<u>COUNT IV</u>
EQUITABLE SUBROGATION
UTICA v. GENERAL STAR INDEMNITY COMPANY

52.    The plaintiffs repeat and reallege the allegations contained in paragraphs 1-51.

53.    General Star had and has a duty to indemnify PTI for losses sustained in connection with the Accident.

54.    Accordingly, equity requires that General Star reimburse Utica for all of the amounts Utica paid to PTI to reimburse PTI for losses sustained in connection with the Accident.

9

## REQUEST FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court award the following relief:

A.      Enter a declaratory judgment on Count I ordering General Star to:

      (i)      indemnify PTI under the Excess Policy for all losses in connection with the Accident, up to the $5,000,000 limit of the Excess Policy;

      (ii)     reimburse PTI for all other damages that PTI has incurred and will incur as a result of General Star's prior disclaimers of coverage; and

      (iii)    reimburse PTI for all legal fees and costs incurred to establish coverage under the Excess Policy.

B.      Enter judgment in plaintiffs' favor against General Star on Counts II and III, and award damages to plaintiffs, including attorney's fees, costs, expenses, and interest.

C.      Award multiple damages to plaintiffs for General Star's willful and knowing violations of M. G. L. c. 93A on Count III.

D.      Enter judgment in Utica's favor on Count IV of the Complaint, and award damages to Utica, including attorney's fees, costs, expenses, and interest.

E.      Award any and all additional relief that the Court deems just and proper.

## JURY DEMAND

The plaintiffs request a trial by jury on all claims and issues so triable.

Respectfully submitted,

PERFORMANCE TRANS., INC.

By its attorney,

/s/ Douglas T. Radigan
Douglas T. Radigan (BBO # 657938)
Bowditch & Dewey, LLP
311 Main Street
Worcester, MA 01608
Phone:  508-791-3511
dradigan@bowditch.com

UTICA MUTUAL INSURANCE COMPANY,

By its attorneys,

/s/ Erin K. Higgins
Erin K. Higgins, Esq. (BBO # 559510)
Catherine M. DiVita, Esq. (BBO # 693446)
Conn Kavanaugh Rosenthal Peisch & Ford, LLP
One Federal Street, 15th Floor
Boston, MA 02110
Phone: 617-482-8200
ehiggins@connkavanaugh.com
cdivita@connkavanaugh.com

2165245.2 07663.168

11

# EXHIBIT A



# GENERAL STAR INDEMNITY COMPANY

## Excess Liability Policy



# GENERAL STAR INDEMNITY COMPANY
STAMFORD, CONNECTICUT 06904-2354
(Hereinafter called the Company)  A Stock Company

# EXCESS LIABILITY DECLARATIONS

THIS POLICY CONSISTS OF THE DECLARATIONS AND THE ATTACHED FORM AND ENDORSEMENTS

**POLICY NUMBER:    IXG927683A**

**ITEM 1.   NAMED INSURED:**          PERFORMANCE TRANS, INC.
                                                      SEE FF001

**ITEM 2.  MAILING ADDRESS**          70 BENSON STREET
                                                      FITCHBURG, MA 01420

**ITEM 3.  POLICY PERIOD:**   03/01/2018   to   03/01/2019
                 12:01 AM Standard Time at the address of the Named Insured as stated above.

In return for the payment of the premium, and subject to all the terms of this policy, **we** agree with **you** to provide the insurance coverage stated in this policy.

**ITEM 4.  LIMIT OF INSURANCE:**

    **Policy Aggregate Limit:**   $5,000,000

**ITEM 5.  PREMIUM FOR POLICY:**

    (a)   Flat Charge:              $104,550          Annual
                                             25% minimum earned premium at inception
    (b)   Deposit Premium:          N/A
    (c)   Minimum Premium:          N/A
    (d)   Rate:                     N/A
    (e)   Audit Reporting Period:   Not Adjustable
                Surplus Lines Tax: Add $4,182.00

**ITEM 6.  FORM AND ENDORSEMENTS ATTACHED:**XS0700 09 2013, XS0001 09 2013, IL600 (01/2010), XS0402 09 2013, XS2100 09 2013, XS2102 12 2013, XS2105 09 2013, XS2110 09 2013, XS2112 09 2013, XS2113 09 2013, XS2114 09 2013, XS2115 09 2013, XS2116 01 2015, XS2125 09 2013, XS2212 04 2016, XS0409 09 2013, XS2111 09 2013, XS2119 09 2013, XS2143 09 2013, XS2215 10 2016, XS2700 12 2013, FF001 (07/1998)

Issued at Stamford, Connecticut this 26th day of March, 2018

### GENERAL STAR INDEMNITY COMPANY

_____
**Authorized Signature**

"This policy is insured by a company which is not admitted to transact insurance in the commonwealth, is not supervised by the commissioner of insurance and, in the event of an insolvency of such company, a loss shall not be paid by the Massachusetts Insurers Insolvency Fund under chapter 175D."

XS1000 09 2013



**EXCESS LIABILITY POLICY**

# SCHEDULE OF UNDERLYING INSURANCE

The selected **CONTROLLING UNDERLYING POLICY** is indicated below by an "X"

<u>X</u>    A.    Insurer    -    HARLEYSVILLE WORCESTER INSURANCE COMPANY

               Coverage    -    Commercial General Liability

               Limits    -    $1,000,000 Each occurrence Bodily Injury and/or Property Damage Liability combined
$2,000,000 General Aggregate
$2,000,000 Products/Completed Operations Aggregate
$1,000,000 Personal and Advertising Injury Limit

<u>X</u>    B.    Insurer    -    NATIONAL FIRE & MARINE INSURANCE, COMPANY

               Coverage    -    Commercial General Liability

               Limits    -    $1,000,000 Each occurrence Bodily Injury and/or Property Damage Liability combined
$2,000,000 General Aggregate
$2,000,000 Products/Completed Operations Aggregate
$1,000,000 Personal and Advertising Injury Limit

<u>X</u>    C.    Insurer    -    THE COMMERCE INSURANCE COMPANY

               Coverage    -    Automobile Liability
(POLICY NO: 18MMBDNSRH)

               Limits    -    $1,000,000 each occurrence Bodily Injury and/or Property Damage Liability combined

<u>X</u>    D.    Insurer    -    THE COMMERCE INSURANCE COMPANY

               Coverage    -    Automobile Liability
(POLICY NO: 18MMBGMTGS)

               Limits    -    $1,000,000 each occurrence Bodily Injury and/or Property Damage Liability combined



# EXCESS LIABILITY POLICY

PLEASE READ THIS POLICY CAREFULLY TO DETERMINE RIGHTS, DUTIES, COVERAGE AND COVERAGE RESTRICTIONS. **WE** HAVE NO DUTY TO INDEMNIFY THE INSURED UNLESS THERE HAS BEEN FULL COMPLIANCE WITH ALL THE CONDITIONS LISTED IN **SECTION IV – EXCESS POLICY CONDITIONS**.

The words **you** and **your** in this policy refer to the **Named Insured** shown in **Item 1.** of the **Declarations.** The word "insured" means any person or organization qualifying as such under the **controlling underlying policy.** The words **we, us, our** and **ourselves** refer to General Star Indemnity Company.

Other words and phrases that appear in bold print have special meaning. Refer to **SECTION V - DEFINITIONS**, or take note of the reference within the text.

## SECTION I - INSURING AGREEMENT

In consideration of the payment of premium and in reliance upon representations **you** made to **us** during the process of obtaining this policy and subject to the **Limit Of Insurance** shown in **Item 4.** of the **Declarations** and all the provisions, conditions, exclusions and limitations of this policy, **we** agree with **you** as follows:

1. COVERAGE - EXCESS LIABILITY

   **We** will indemnify the insured for **ultimate net loss** in excess of the total of the limits of **underlying insurance** that is covered by both the **controlling underlying policy** and this policy. **We** will not indemnify the insured, however, for any such **ultimate net loss** incurred in connection with any **event**, claim or suit that is subject to a sublimit in any **underlying insurance**. Coverage under this policy will not attach until the limits of all **underlying insurance** have been paid in full and all such applicable limits of the **underlying insurance** have been exhausted.

   The amount **we** will indemnify for **ultimate net loss** and pay for **costs** is limited as described in **SECTION III - LIMIT OF INSURANCE**.

2. APPLICATION OF CONTROLLING UNDERLYING POLICY

   Except for the express provisions of this policy, this policy will follow the provisions, conditions, exclusions and limitations of the **controlling underlying policy**. Should there be a conflict between the provisions of this policy and the **controlling underlying policy**, then the provisions of this policy will govern. However, nothing in this paragraph shall or is intended to make the coverage provided by this policy broader than that provided by the **controlling underlying policy**.

## SECTION II - INVESTIGATION, DEFENSE AND SETTLEMENT

1. **We** will not be obligated to investigate, defend or settle any claim or suit against the insured, but **we** will have the right and be given the opportunity to associate with the insured and the insurer providing the applicable **underlying insurance** in the defense and control of any claims or suits that **we** believe may involve this policy. If **we** exercise such right, the insured and its insurer(s) agree to cooperate with **us** in such defense. If **we** avail **ourselves** of such right, any **costs** **we** incur will be at **our** expense. The insured will not make or agree to any settlement for an amount in excess of **underlying insurance** without **our** prior approval.

Copyright, General Star Management Company, 2013
Includes copyrighted material of Insurance Services Office, Inc. with its permission



2.  a.  **We** will:

     (1) Have the right but not the duty to assume control of the defense from any underlying insurer of any claims or suits that **we** believe may involve this policy.  If **we** avail **ourselves** of such right, **we** will pay subsequent **costs**, as described in 2.b. below, after **we** assume control of the defense; and

     (2) Pay **costs** incurred directly by the insured with **our** written consent and for which the insured is not covered by **underlying insurance** because of the exhaustion of the **underlying insurance**.

  b.  When **we** assume control of the defense pursuant to 2.a. above, **we** will follow the terms of the **controlling underlying policy** with respect to coverage for **costs**.  If the **controlling underlying policy** specifies that the limits are:

     (1) Reduced by defense expenses, subsequent **costs** **we** incur will also reduce **our Limit Of Insurance**; or

     (2) Not reduced by defense expenses, subsequent **costs** **we** incur will be in addition to **our Limit Of Insurance**.

  c.  **Our** defense of such claims or suits and payment of such **costs** ends when **our Limit Of Insurance** has been exhausted by the payment of **ultimate net loss**.

3.  If the insured elects not to appeal a judgment in excess of the limits of **underlying insurance**, **we** may elect to conduct such appeal at **our** expense and **we** will be liable for **costs** of such appeal but in no case will **our** total liability for **ultimate net loss** exceed **our Limit Of Insurance**.

## SECTION III – LIMIT OF INSURANCE

1.  The **Policy Aggregate Limit** shown in **Item 4.** of the **Declarations** and the rules below fix the most **we** will indemnify regardless of the number of:

  a.  Insureds;

  b.  Claims made or suits brought; or

  c.  Persons or organizations making claims or bringing suits.

2.  Subject to 1. above, the **Policy Aggregate Limit** is the most **we** will indemnify for each of the following:

  a.  With respect to each covered **event** to which underlying Auto Liability Insurance applies, the sum of

     (1) **Ultimate net loss**; and

     (2) Any **costs** **we** incur when paragraph 2.b.of **SECTION II - INVESTIGATION, DEFENSE AND SETTLEMENT** applies, but only when the **controlling underlying policy** specifies that the limits are reduced by defense expenses;

  b.  With respect to each covered **event**, and all such **events** in the aggregate, that is included in the products-completed operations hazard and to which underlying Auto Liability Insurance does not apply, the sum of:

Copyright, General Star Management Company, 2013
Includes copyrighted material of Insurance Services Office, Inc. with its permission



(1) **Ultimate net loss**; and

(2) Any **costs we** incur when paragraph 2.b. of **SECTION II - INVESTIGATION, DEFENSE AND SETTLEMENT** applies, but only when the **controlling underlying policy** specifies that the limits are reduced by defense expenses; or;

c. With respect to each covered **event**, and all such **events** in the aggregate, not included in the products-completed operations hazard and to which underlying Auto Liability Insurance does not apply, the sum of:

(1) **Ultimate net loss**; and

(2) Any **costs we** incur when paragraph 2.b. of **SECTION II - INVESTIGATION, DEFENSE AND SETTLEMENT** applies, but only when the **controlling underlying policy** specifies that the limits are reduced by defense expenses.

There shall be no other policy aggregate limits, including but not limited to, per location aggregates, per project aggregates or per **event** aggregates.

3. If **we** have paid a **Policy Aggregate Limit** prior to this policy's termination date or cancellation date, if any, this policy's premium is fully earned.

4. If any **underlying insurance** has a **Policy Period** that is different from the **Policy Period** of this policy, the limits of any such **underlying insurance** will, for the purposes of this policy, be reduced or exhausted only by payments made for **ultimate net loss** to which this policy would apply if such **ultimate net loss** was subject to payment covered under this policy.

5. The **Policy Aggregate Limit** applies separately to each consecutive annual period, and to any remaining period of less than twelve (12) months, starting with the inception date shown in **Item 3.** of the **Declarations**, unless the **Policy Period** is extended after issuance of this policy for an additional period of less than twelve (12) months. In that case, the additional period will be deemed part of the last preceding period for purpose of determining the **Limit Of Insurance**.


## SECTION IV – EXCESS POLICY CONDITIONS

1. BANKRUPTCY

Bankruptcy, insolvency, or receivership of the insured or the insured's estate will not relieve **us** of **our** obligations under this policy.

2. CANCELLATION

a. The **First Named Insured** shown in **Item 1.** of the **Declarations** may cancel this policy by delivering the policy to **us** or any of **our** authorized agents, or by sending **us** advance written notice of cancellation. Cancellation will become effective the date of delivery of the policy or written notice to **us** or upon such future date requested by the **First Named Insured's** written notice.

b. **We** may cancel this policy by mailing or delivering to the **First Named Insured** written notice of cancellation at least:



    (1) Ten (10) days before the effective date of cancellation if **we** cancel because of nonpayment of premium whether payable directly to **us** or payable to **our** agents or others under any installment payment plan, premium finance plan, extension of credit or other payment plan; or

    (2) Thirty (30) days before the effective date of cancellation if **we** cancel for any other reason.

c.    **We** will mail or deliver **our** notice to the **First Named Insured's** last mailing address known to **us**.

d.    Notice of cancellation will state the effective date of cancellation.  The **Policy Period** will end on that date.

e.    If this policy is canceled, **we** will send the **First Named Insured** any premium refund due.  If **we** cancel, the premium refund will be pro rata. If the **First Named Insured** cancels, the premium refund will be 90% of pro rata unless the premium is deemed fully earned pursuant to **SECTION III – LIMIT Of INSURANCE**, paragraph 3. in which case no premium will be refunded.  The cancellation will be effective even if **we** have not made or offered any refund of unearned premium.

f.    If notice is mailed, proof of mailing will be sufficient proof of notice.

3.  CHANGES

This policy contains all the agreements between **you** and **us** concerning the insurance afforded. The **First Named Insured** shown in **Item 1.** of the **Declarations** is authorized to make changes in the terms of this policy upon **our** giving written consent. This policy's terms can be amended or waived only by endorsement to this policy issued by **us**.

4.  EXAMINATION OF YOUR BOOKS AND RECORDS

**We** may examine and audit **your** books and records as they relate to this policy at any time during the **Policy Period** set forth in **Item 3.** of the **Declarations** and up to three years afterward.

5.  INSURED'S DUTIES IN THE CASE OF AN EVENT, CLAIM OR SUIT

a.    In the case of an **event** covered hereunder involving injuries or damages that, without regard to legal liability, may result in a claim or suit against the insured, the insured must as soon as practicable provide written notice to **us**. The notice to **us** shall identify all insureds involved with the **event**; provide reasonably obtainable information with respect to the time, place and circumstances of the **event**; and provide the names and addresses of any injured persons and any witnesses to the **event**.

b.    If claim is made or suit is brought against the insured because of an **event** covered hereunder, the insured shall immediately forward to **us** every demand, notice, summons or other process and complaint or other pleading received by the insured or the insured's representative.

c.    The insured will cooperate with **us** in the defense of a claim or suit and at **our** request assist in making settlement and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured for injuries or damages to which insurance is afforded under this policy.

d.    At **our** request, the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

Copyright, General Star Management Company, 2013
Includes copyrighted material of Insurance Services Office, Inc. with its permission



e. The insured shall not, except at such insured's own expense, admit liability, voluntarily make any payment or assume any obligation.

6. LEGAL ACTION AGAINST US

No person or organization has a right under this policy:

a. To join **us** as a party or otherwise bring **us** into a suit asking for damages from an insured; or

b. To sue **us** under this policy unless all of its terms have been complied with fully.

A person or organization may sue **us** to recover on an **agreed settlement** or on a final judgment against an insured obtained after an actual trial; but **we** will not be liable for damages that are not payable under the terms of this policy or that are in excess of the applicable **Limit Of Insurance**.

7. LOSS PAYABLE

If the amount of **ultimate net loss** becomes certain through court judgment, **agreed settlement**, binding arbitration or other alternative dispute resolution proceeding entered into with **our** consent, then: (i) the insured may pay the amount of **ultimate net loss** to the claimant and upon submission of due proof thereof, **we** will indemnify the insured for the part of such payment that is in excess of the total limits of **underlying insurance** and covered by this policy or (ii) **we** will, upon request of the insured, make such payment to the claimant on behalf of the insured after the underlying insurers have paid or have been held legally liable to pay the full amount of their respective limits of liability as stated in the SCHEDULE OF UNDERLYING INSURANCE.

8. MAINTENANCE OF UNDERLYING INSURANCE

a. **You** must keep the **underlying insurance**, or any renewals or replacements thereof, in effect during the period of this policy. The limits of **underlying insurance** must be maintained without reduction other than by payment of damages, **costs** or expenses that arise out of **events** to which this insurance applies.

   **Your** failure to comply with the foregoing will not invalidate this policy, but in the case of such failure, **we** shall be liable under this policy only to the extent that **we** would have been liable had **you** complied with these obligations.

b. **You** must notify **us** in writing immediately of:

   (1) Any cancellation, non-renewal or replacement of any policy of **underlying insurance**.
   (2) The exhaustion of any **underlying insurance** aggregate limits.
   (3) Any changes to the terms of any **underlying insurance** which:
      (a) Change the scope of coverage or limits of insurance; or
      (b) Provide coverage to a **Named Insured** that was not a **Named Insured** at the inception of this policy.

   These changes will not apply unless **we** agree to them in writing as a condition precedent to such coverage under this policy. **We** may adjust the premium from the effective date of such changes.



c.  In the case of bankruptcy, insolvency, or receivership of any underlying insurer, or **your** having breached this condition by failing to maintain all of the **underlying insurance,** this policy shall not drop down or apply as a replacement of such bankrupt or insolvent insurer or such unavailable insurance.  This policy will only apply in excess of the total of the limits of **underlying insurance** as stated in the SCHEDULE OF UNDERLYING INSURANCE.

9.  OTHER INSURANCE

If other valid and collectible insurance with any other insurer is available to the insured covering a loss or **costs** also covered by this policy, other than insurance that is written to specifically be in excess of this policy, the insurance afforded by this policy shall be in excess of, and shall not contribute with, such other insurance.

10.  PREMIUMS AND AUDIT

a.  Premium shown in this policy as a deposit premium is an advance premium only. At the close of each audit period, **we** will compute the earned premium for that period. Any additional audit premiums are due and payable on notice to the **First Named Insured**. If the sum of the deposit and audit premiums paid for the policy term is greater than the earned premium, **we** will return the excess to the **First Named Insured**, but not if such audit premium is less than the Minimum Premium shown in **Item 5.** of the **Declarations**.

b.  The **First Named Insured**:

(1)  Must keep records of the information **we** need for premium computation and send **us** copies at such times as **we** may request;
(2)  Is responsible for the payment of all premiums; and
(3)  Will be the payee for any return premiums **we** pay.

11.  REPRESENTATIONS

By accepting this policy, **you** agree on behalf of **yourself** and all insureds that:

a.  The information shown on the **Declarations** is accurate and complete;

b.  The information is based upon representations **you** made to **us**, including representations in any application submitted to **us** for this insurance;

c.  **We** have issued this policy in reliance upon **your** representations; and

d.  Except as otherwise provided, this policy is void if **you** conceal or misrepresent any material facts in **your** application for this policy.

12.  TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If the insured has rights to recover all or part of any payment **we** have made under this policy, those rights are transferred to **us**. The insured must not do anything after loss or the commencement of a claim or suit to impair them. At **our** request, the insured will bring suit or transfer those rights to **us** and help **us** enforce them.

Any recoveries shall be applied first to reimburse any interests (including the insured's) that may have paid any amounts in excess of **our** liability under this policy; then to reimburse **us** for any payment hereunder; and lastly to reimburse such interests (including the insured's) over which this policy is excess.



When **we** assist in pursuit of the insured's rights of recovery, reasonable expenses resulting therefrom shall be apportioned among all interests in the ratio of their respective recoveries. If there should be no recovery as a result of proceedings instituted solely at **our** request, **we** shall pay all expenses of such proceedings.

13. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

**Your** rights and duties under this policy may not be transferred without **our** written consent

## SECTION V - DEFINITIONS

When used in this policy, including endorsements forming a part hereof:

1. **Agreed settlement** means a settlement and release of liability signed by the insured and the claimant, or by their legal representatives, and for which **we** have provided advance written consent.

2. **Controlling Underlying Policy**:

   The term **controlling underlying policy** means the insurance policy or policies designated as such in the SCHEDULE OF UNDERLYING INSURANCE. If no policy is so designated, then the highest layer set forth in the SCHEDULE OF UNDERLYING INSURANCE for a particular coverage will be deemed the **controlling underlying policy**.

3. **Costs**:

   The term **costs** means:

   a. Attorneys' fees and all other litigation expenses not described in items b. through f. below.

   b. The cost of bonds to release attachments, but only for bond amounts within **our** applicable **Limit Of Insurance**. **We** do not have to furnish these bonds.

   c. All reasonable expenses incurred by the insured at **our** request to assist **us** in the investigation or defense of any claim or suit.

   d. All **costs** taxed against the insured in the suit. However, these payments do not include a claimant's attorneys' fees or expenses taxed or awarded against the insured.

   e. Pre-judgment interest awarded against the insured on that part of the judgment covered under this policy. If **we** offer to pay the applicable **Limit Of Insurance** in settlement of a claim or suit, **we** will not pay any pre-judgment interest accrued after the date of such offer.

   f. All interest accrued on that part of any judgment within the **Limit Of Insurance** after entry of the judgment and before **we** have indemnified, offered to indemnify or pay, or deposited in court that part of any judgment that is within the applicable **Limit Of Insurance**.

   **Costs** do not include salaries and expenses of **our** employees or the insured's employees.

4. **Event**:

   The term **event** means an accident, occurrence, offense, act, error or omission, or similar terms, as defined in the liability coverage of the **controlling underlying policy**.



5.  **First Named Insured**:

   The term **First Named Insured** means the person or organization first named in **Item 1.** of the **Declarations** of this policy, which person or organization is authorized to act as sole agent on behalf of all insureds with respect to giving or receiving notice of cancellation, receiving unearned premium, and agreeing to any changes in this policy.

6.  **Ultimate Net Loss**:

   The term **ultimate net loss**:

   a.  Means the sum of all damages, after the reduction for salvages and recoveries, which the insured, or any insurer providing **underlying insurance**, or both, shall become legally obligated to pay, whether by reason of adjudication, **agreed settlement**, binding arbitration or other alternative dispute resolution proceeding entered into with **our** consent, because of an **event** covered by such **underlying insurance** and this policy.

   b.  Does not include **costs**, except when **costs** are paid by **underlying insurance** and are included in its limits.

7.  **Underlying Insurance**:

   a.  The term **underlying insurance**:

      (1)  Means all of the primary or excess insurance policies, including the **controlling underlying policy**, contributing to the limits stated in the SCHEDULE OF UNDERLYING INSURANCE, including any deductible amount(s), insured's participation(s) or self insured retention(s) beneath any such policy, and includes any renewals or replacements thereof; and

      (2)  Includes any other policy's or policies' limits which are not listed in the SCHEDULE OF UNDERLYING INSURANCE, but which provide underlying coverage to those policies that are listed in the SCHEDULE OF UNDERLYING INSURANCE.  Such policy's or policies' limits are in addition to the limits stated in the SCHEDULE OF UNDERLYING INSURANCE.

   b.  The limits of **underlying insurance** as described in a.(1) and (2) above are deemed to be applicable regardless of:

      (1)  Any defense that the underlying insurer may assert;
      (2)  The insured's failure to comply with any condition in any such policy; or
      (3)  The insolvency of the underlying insurer.

# GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SERVICE OF SUIT CLAUSE

It is agreed that in the event of the failure of General Star Indemnity Company (the "Insurer") to pay any amount claimed to be due hereunder, the Insurer, at the request of the insured, will submit to the jurisdiction of any Court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give such Court jurisdiction.  All matters arising hereunder shall be determined in accordance with the law and practice of such Court.  However, nothing in this provision constitutes a waiver of the Insurer's rights to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States of America or of any State in the United States.

It is further agreed that service of process in such suit may be made upon the Insurer by certified mail, return receipt requested, addressed to the Insurer in care of its **Corporate Secretary**, Attention: Legal Department, General Star Indemnity Company, 120 Long Ridge Road, Stamford, CT 06902-1843.  In any suit instituted under this contract, Insurer will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-referenced Corporate Secretary, or his designee, is authorized and directed to accept service of process on behalf of the Insurer in any such suit or upon the request of the insured to give a written undertaking to the insured that it will enter a general appearance upon the Insurer's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America, which makes provision therefor, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance, or such other insurance department representative, or such other governmental officer, such as the Secretary of State, specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the Insurer's Corporate Secretary as the person to whom the said insurance department representative is authorized to mail such process or a true copy thereof.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.** <u>1</u>

**Effective Date of this Endorsement:** <u>03/01/2018</u>          **Policy No.** <u>IXG927683A</u>

## AMENDMENT OF INSURING AGREEMENT – KNOWN INJURY OR DAMAGE

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

The provisions of this endorsement apply only when the **underlying insurance** is on an other than claims- made basis.

A.   **SECTION I – INSURING AGREEMENT**, paragraph 1., COVERAGE – EXCESS LIABILITY is deleted and replaced by the following:

1.   COVERAGE - EXCESS LIABILITY

   a.   **We** will indemnify the insured for **ultimate net loss** in excess of the total of the limits of **underlying insurance** that is covered by both the **controlling underlying policy** and this policy. **We** will not indemnify the insured, however, for any such **ultimate net loss** incurred in connection with any **event**, claim or suit that is subject to a sublimit in any **underlying insurance**. Coverage under this policy will not attach until the limits of all **underlying insurance** have been paid in full and all such applicable limits of the **underlying insurance** have been exhausted.

   b.   This insurance applies to **ultimate net loss** because of injury or damage, to which this insurance applies, only if prior to the **POLICY PERIOD**, no **authorized entity** knew that the injury or damage had occurred, in whole or in part.  If such **authorized entity** knew, prior to the **POLICY PERIOD**, that the injury or damage occurred, then any continuation, change or resumption of such injury or damage during or after the **POLICY PERIOD** will be deemed to have been known prior to the **POLICY PERIOD**.

   c.   Injury or damage which occurs during the **POLICY PERIOD** and was not, prior to the **POLICY PERIOD**, known to have occurred by an **authorized entity** includes any continuation, change or resumption of that injury or damage after the end of the **POLICY PERIOD**.

   d.   Injury or damage will be deemed to have been known to have occurred at the earliest time when any **authorized entity**:

      Reports all, or any part, of the injury or damage to **us** or any other insurer;

      (1)   Receives a written or verbal demand or claim for damages because of the injury or damage; or

      (2)   Becomes aware by any other means that injury or damage has occurred or has begun to occur.



    e.    The amount **we** will indemnify for **ultimate net loss** and pay for **costs** is limited as described in **SECTION III - LIMIT OF INSURANCE**.

B.    **SECTION V – DEFINITIONS** is amended by the addition of the following:

**Authorized entity(ies)** means any entity or person that meets any of the following criteria:

1.    Any entity:

    a.    Listed in **Item 1.** of the **Declarations**; or

    b.    Listed as an insured on the **Declarations** of the **underlying insurance** and/or treated by the **underlying insurance** as a **Named Insured**.

2.    If the entity as specified in paragraph 1. above is:

    a.    An individual, that individual's spouse is an **authorized entity**.

    b.    A partnership or joint venture, that partnership or joint venture's members, partners, and their spouses are **authorized entities**.

    c.    A limited liability company, that limited liability company's members and managers are **authorized entities**.

    d.    An organization other than a partnership, joint venture or limited liability company, that organizations executive officers and directors are **authorized entities**.

3.    Any employee of an entity, as specified in paragraph 1. above, who is authorized by such entity to give or receive notice of an **event** or claim.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Endorsement No. __2__

**Effective Date of this Endorsement:** __03/01/2018__          **Policy No.** __IXG927683A__

## EXCLUSION – NUCLEAR ENERGY LIABILITY

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to damages for which any insured is liable, or loss, **costs** or expenses, arising out of, resulting from caused by or contributed to by

**NUCLEAR ENERGY LIABILITY**

a. Under any Liability Coverage, to damages:

    (1) With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

b. Under any Liability Coverage, to damages resulting from "hazardous properties" of "nuclear material", if:

    (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (b) has been discharged or dispersed therefrom;

    (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

    (3) The damages arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to property damage to such "nuclear facility" and any property thereat.

c. As used in this endorsement:

    "Hazardous properties" includes radioactive, toxic or explosive properties.

    "Nuclear material" means "source material", "special nuclear material" or "by-product material".

    "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

    "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".



"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

    (a) Any "nuclear reactor";

    (b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

    (c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

    (d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

Damages includes all forms of radioactive contamination of property.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**   3

**Effective Date of this Endorsement:**   03/01/2018          **Policy No.**   IXG927683A

## EXCLUSION – CROSS SUITS

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to any claim for injury or damages actually or allegedly caused by a **Named Insured** covered by this policy, when the party sustaining the actual or alleged injury or damage is any other **Named Insured** covered under this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Endorsement No.** 4

**Effective Date of this Endorsement:** 03/01/2018          **Policy No.** IXG927683A

## EXCLUSION – BISPHENOL A

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY POLICY**

This policy does not apply to;

1.   Any damages for which any insured is legally liable, or loss, **costs** or expenses, actually or allegedly arising out of, resulting from, caused by or contributed to by bisphenol A or exposure to bisphenol A or the use of bisphenol A;

2.   Any damages or any loss, **costs** or expense arising out of any: (i) claim or suit by or on behalf of any governmental authority or any other alleged responsible party because of, or (ii) request, demand, order or statutory or regulatory requirement that any insured or any other person or entity should be, or should be responsible for:
     a.   Assessing the presence, absence, or amount or effects of bisphenol A;
     b.   Identifying, sampling or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of or mitigating bisphenol A or
     c.   Responding to bisphenol A in any way other than as described in 2.a. and b. above;

3.   Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with any of the subsections above; or

4.   Any obligation to share damages with or repay someone else who must pay damages as described in any of the subsections above.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**Endorsement No.**   5

**Effective Date of this Endorsement:**   03/01/2018          **Policy No.**   IXG927683A

## EXCLUSION – SILICA

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to damages for which the insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by:

1.   Silica, silica in combination with other particulate suspension(s) or dust(s) or particulate suspensions(s) or dust(s) other than silica;

2.   Any (i) claim or "suit" by or on behalf of any governmental authority or any other alleged responsible party because of, or (ii) request, demand, order or statutory or regulatory requirement that any insured or any other person or entity should be, or should be responsible for:

    a.   Assessing the presence, absence, amount or effects of silica, dust(s) or particulate suspension(s);
    b.   Identifying, sampling, testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of or mitigating silica, dust(s) or particulate suspension(s); or
    c.   Responding to silica, dust(s) or particulate suspension(s) in any way other than as described in 2. a. and b. above;

3.   Any supervision, instruction, recommendation, warning or advice given or which should have been given in connection with any of the subsections above; or

4.   Any obligation to share damages, loss, **costs** or expenses with or repay someone else in connection with any of the subsections above.

This exclusion does not apply to damages resulting from drugs, supplements, herbal products or foods containing silica intended for human or animal consumption.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

Endorsement No.   6

**Effective Date of this Endorsement:**   03/01/2018          **Policy No.**   IXG927683A

## EXCLUSION – TOTAL ASBESTOS

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to:

1.  Any damages for which the insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by asbestos, exposure to asbestos or the use of asbestos;

2.  Any damages or any loss, **costs** or expense arising out of any (i) claim or suit by or on behalf of any governmental authority or any other alleged responsible party because of, or (ii) request, demand, order or statutory or regulatory requirement that any insured or any other person or entity should be, or should be responsible for:
    a.  Assessing the presence, absence or amount or effects of asbestos;
    b.  Identifying, sampling or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of or mitigating asbestos;  or
    c.  Responding to asbestos in any way other than as described in 2.a. and b. above;

3.  Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with any of the subsections above; or

4.  Any obligation to share damages with or repay someone else in connection with any of the subsections above.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**  7

**Effective Date of this Endorsement:**  03/01/2018       **Policy No.**  IXG927683A

## EXCLUSION – LEAD

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to:

1.  Any damages for which the insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by arising out of, resulting from, caused by or contributed to by the toxic or pathological properties of lead, lead compounds or lead contained in any materials;

2.  Any (i) claim or suit by or on behalf of any governmental authority or any other alleged responsible party because of, or (ii) request, demand, order or statutory or regulatory requirement that any insured or any other person or entity should be, or should be responsible for:
    a.  Assessing the presence, absence or amount or effects of lead, lead compounds or lead contained in any materials;
    b.  Identifying, sampling or testing for, detecting, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, abating, disposing of or mitigating lead, lead compounds or lead contained in any materials; or
    c.  Responding to lead, lead compounds or lead contained in any materials in any way other than as described in 2.a. and b. above;

3.  Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with any of the subsections above; or

4.  Any obligation to share damages, loss, **costs** or expenses with or repay someone else in connection with any of the subsections above.


ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Endorsement No.   8

**Effective Date of this Endorsement:**   03/01/2018          **Policy No.**   IXG927683A

## EXCLUSION – FUNGUS, BACTERIA OR SPORE

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to damages for which the insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by:

1.   Any **fungus(i)**, bacteria or **spore(s)**;

2.   Any substance, vapor, gas, scent or byproducts produced by or arising out of any **fungus(i)**, bacteria or **spore(s)**;

3.   Any material, product, building component, building or structure that contains, harbors, nurtures or acts as a medium for any **fungus(i)**, bacteria or **spore(s)**;

4.   Any testing for, monitoring, abatement, mitigation, removal, remediation or disposal of **fungus(i)**, bacteria or **spore(s)**;

5.   Any supervision, instructions, recommendations, warnings or advice given or which should have been given in connection with the above; or

6.   Any obligation to share damages with or repay anyone else who must pay damages in connection with parts 1., 2., 3., 4., or 5. above.

The above applies regardless of any other cause, event, material, product or building component that contributed concurrently or in any sequence to such damages for which the insured is legally liable, loss, **costs** or expenses.

This exclusion does not apply to and **fungus(i)** or bacteria that are, are on, or are contained in, a good or product intended for human consumption.

For the purpose of this exclusion, the following definitions are added:

a.   **Fungus(i)** includes, but is not limited to, any form or type of mildew, mold, mushroom, rust, smuts, or yeast, including any allergens, irritants, mycotoxins, or scents, byproducts, microbial volatile organic compounds produced by or associated therewith.

b.   **Spore(s)** means any reproductive body produced by or arising out of any **fungus(i)**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Endorsement No.   9

Effective Date of this Endorsement:   03/01/2018          Policy No.   IXG927683A

## EXCLUSION – EMPLOYMENT RELATED PRACTICES

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to damages to a person for which any insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by:

1.      Refusal to employ that person;

2.      Termination of that person's employment;

3.      Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, malicious prosecution directed at that person; or

4.      The spouse, child, parent, brother or sister of that person as a consequence of injury or damage to that person at whom any of the employment-related practices described in Paragraphs 1., 2. or 3. above is directed.

This exclusion applies:

a.      Whether the injury-causing event described in Paragraphs 1., 2. or 3. above occurs before employment, during employment or after employment of that person;

b.      Whether the insured may be liable as an employer or in any other capacity; and

c.      To any obligation to share damages with or repay someone else who must pay damages because of the injury or damage.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**  10

**Effective Date of this Endorsement:**  03/01/2018     **Policy No.**  IXG927683A

## EXCLUSION – CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

Any endorsement addressing acts of terrorism (however defined) in any **controlling underlying policy** does not apply to this excess insurance. The following provisions addressing acts of terrorism apply with respect to this excess insurance:

**A.**  The following exclusion is added:

This insurance does not apply to:

**TERRORISM**
"Any injury or damage arising, directly or indirectly, out of a "certified act of terrorism".

**B.**  The following definitions are added:

   **1.**  For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

   **2.**  "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

     **a.**  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

     **b.**  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**C.**  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for "any injury or damage" that is otherwise excluded under this Coverage Part.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**   11

**Effective Date of this Endorsement:**   03/01/2018          **Policy No.**   IXG927683A

## EXCLUSION – CARE, CUSTODY OR CONTROL

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to any damages for which any insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by, or aggravated by **property damage** to:

1. Property **you** own, rent, or occupy, including any costs or expenses incurred by **you**, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

2. Premises **you** sell, give away or abandon, if the **property damage** arises out of any part of those premises;

3. Property loaned to **you**;

4. Property in the care, custody or control of the insured;

5. That particular part of property on which **you** or any contractors or subcontractors working directly or indirectly on **your** behalf are performing operations, if the **property damage** arises out of those operations; or

6. That particular part of any property that must be restored, repaired or replaced because work or operations performed by **you** or on **your** behalf was incorrectly performed on it.

As used in this endorsement:

**Property damage** means:

1. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

2. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the **event** that caused it; or

3. Any other damage to property for which coverage is afforded by the **underlying insurance**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**  12

**Effective Date of this Endorsement:**  03/01/2018          **Policy No.**  IXG927683A

## EXCLUSION – ACCESS OR DISCLOSURE OF CONFIDENTIAL OR PERSONAL INFORMATION AND DATA-RELATED LIABILITY - WITH LIMITED BODILY INJURY EXCEPTION

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

A.  This policy is amended by the addition of the following exclusion:

This insurance does not apply to:

Injury or damage, loss, costs and expenses caused by an **event** arising, directly or indirectly, out of, resulting from, caused by or contributed to by:

1.  Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

2.  The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate **electronic data**.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, costs or expenses incurred by any insured or others arising out of that which is described in Paragraph 1. or 2. above.

However, unless Paragraph 1. above applies, this exclusion does not apply to damages because of **bodily injury**.  **Bodily injury**, as used in this exclusion, means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

As used in this exclusion, **electronic data** means information, facts or programs stored as or on, created or used on, or transmitted  to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Endorsement No. <u>13</u>

**Effective Date of this Endorsement:** <u>03/01/2018</u>     **Policy No.** <u>IXG927683A</u>

## SPECIAL HAZARDS AND FLUIDS LIMITATION ENDORSEMENT

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to **ultimate net loss** or **costs** from any **event** arising out of, contributed by or relating to any Special Hazard described in this endorsement and resulting from the ownership, maintenance or use of any auto.

Special Hazards:

**A.  Radiation Hazard**
**B.  Underground Hazard**
**C.  Drilling Fluids Unloading Hazard**

However, this exclusion does not apply to an **event** arising out of the unloading of **drilling fluids** from an auto covered by this policy and covered by the **controlling underlying insurance** for the total limits of the **underlying insurance**, if the unloading of **drilling fluids** resulted directly from any of the following:

1.  Heat, smoke or fumes from a **hostile fire**;
2.  Upset or overturn of such auto;
3.  A collision between such auto being used in your business and another object; or
4.  A **short term drilling fluid event**, provided that coverage under this item 4:
    a.  Will be available to bodily injury or property damage, but not damage to real property or to a body of water or to any other natural resource; and
    b.  Will not be available unless written notice of the **short term drilling fluid event** is given to us or the **controlling underlying insurance** company as soon as practicable, but no more than thirty (30) days after the shipment of the **drilling fluids** was entrusted to your care.

If any other limit, such as a sublimit, is specified in the **underlying insurance**, then paragraphs 1. and 2. above will not apply unless that limit is specified in the SCHEDULE OF UNDERLYING INSURANCE.

DEFINITIONS

Additional definitions as used in this endorsement:

**Drilling Fluids** means liquids which are used in or result from oil or gas drilling, extraction or recovery operations, regardless if the liquids contain gases, chemicals, solids, additives or proppants.  Such liquids include, but are not limited to, flowback water, brine water, hydraulic fracturing fluids, lubricants or slippery water.  Drinking quality water does not fall within this definition.



**Drilling Fluids Unloading Hazard** means the unloading of **drilling fluids** from any auto, mobile equipment, machinery or equipment, whether unloading is the result of movement of property by a mechanical device, an accident, a **spill** or otherwise.

**Hostile Fire** means a fire which becomes uncontrollable or breaks out from where it was intended to be.

**Radiation Hazard** means the existence of, threats from or contamination by radioactive elements or substances including, but not limited to, naturally occurring radioactive materials (NORM) in flowback water.

**Short Term Drilling Fluid Event** means a **spill** from where **drilling fluids** were intended to be if the **spill** was caused, in whole or in part, by or on behalf of an Insured during the unloading from an auto covered by this policy being used in your business.  Such **spill** must:

1. Begin during the policy period;
2. Begin at an identified time and place;
3. End, in its entirety, at an identified time within forty eight (48) hours of the beginning of the **spill**.
4. Not be a repeat or resumption of a previous **spill** of the same **drilling fluids** from essentially the same source within twelve (12) months of a previous **spill**;
5. Occur away from any property that is owned, operated or supervised by or entrusted to an Insured or is in the care, custody or control by or on behalf of an Insured;
6. Not originate from an **underground hazard**; and
7. Not be the result of a **hostile fire**, upset or overturn of an auto covered by this policy or collision directly involving such auto.

The **spill** need not be continuous.  However, if the **spill** is not continuous, then all discharges, dispersals, releases or escapes of the same **drilling fluids** from essentially the same source, considered together, must satisfy Provisions 1. through 7. of this definition to be considered a **short term drilling fluid event.**

**Spill** means a discharge, dispersal, release or escape of **drilling fluids**.

**Underground Hazard** means any subsurface solid, liquid or gas, below-grade structure or geological formation that is beneath the surface of the earth or the surface of a manmade or natural body of water.  Such hazard includes, but is not limited to, crude oil, gas, groundwater, brine water, silica, soils, minerals, natural resources, chemicals, additives, manmade substances, machinery, equipment, pipes, casings, pumps, valves, tools, bits or any other drilling equipment, containers, lagoons, retention ponds, seismic equipment or earth movement.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

Endorsement No.  14

Effective Date of this Endorsement:  03/01/2018          Policy No.  IXG927683A

## EXCLUSION – TOTAL POLLUTION

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

1.  This policy does not apply to any damages for which the insured is legally liable, or loss, **costs** or expenses arising out of, resulting from, caused by or contributed to by:

    a.  The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time.

    b.  Any loss, **costs** or expense arising out of any:
        (1)  Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
        (2)  Claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

    Any actual or alleged: breach of duty, negligent act, error or omission, of any insured or of any person for whose acts any insured is legally liable which results in damages, loss, **costs** or expense as described in a. or b. above.

2.  This policy does not apply to any damages for which the insured is legally liable, loss, **costs** or expenses arising out of, resulting from, caused by or contributed to by **pollutants** regardless of whether the **underlying insurance** affords coverage for such damages, loss, **costs** or expenses.

**Pollutants** means:

(a)  Any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed; and

(b)  Any other substance defined as, treated as or considered to be **pollutants** by the **underlying insurance**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**   15

**Effective Date of this Endorsement:**   03/01/2018        **Policy No.**   IXG927683A

## EXCLUSION – UNINSURED OR UNDERINSURED MOTORIST COVERAGE

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to any loss, **costs** or expense payable under or resulting from any liability imposed on the insured or the insured's insurer, under any uninsured or underinsured motorist coverage.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Endorsement No.**   16

**Effective Date of this Endorsement:**   03/01/2018          **Policy No.**   IXG927683A

## EXCLUSION – DESIGNATED ENTITIES-ALL HAZARDS

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

### SCHEDULE

**Designated Entity(ies):**

  1. TD LOGISTICS INC.

This policy does not apply to damages for which the insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by any entity(ies) designated in the SCHEDULE above.  The entity scheduled above is not an insured with respect to this policy.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

Endorsement No.   17

Effective Date of this Endorsement:   03/01/2018

Policy No.   IXG927683A

## EXCLUSION – TRANSPORTATION BROKER OR FREIGHT FORWARDER OPERATIONS

This endorsement modifies insurance provided under the following:

### EXCESS LIABILITY POLICY

This policy does not apply to any **ultimate net loss**, or loss, **costs** or expenses arising, directly or indirectly, out of, resulting from, caused by or contributed to by transportation broker or freight forwarder operations conducted by any insured or conducted by anyone on behalf of the insured and whether such operations are conducted for the insured or for others.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.



## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Endorsement No.   18

Effective Date of this Endorsement:   03/01/2018          Policy No.   IXG927683A

## EXCESS CLAIMS-MADE INSURANCE-
## EVENT THAT TAKES PLACE ON OR AFTER RETROACTIVE DATE

This endorsement modifies insurance provided under the following:

## EXCESS LIABILITY POLICY

IF ANY **CONTROLLING UNDERLYING POLICY** IS WRITTEN ON A CLAIMS-MADE BASIS, THE FOLLOWING APPLIES TO THE INSURANCE PROVIDED BY THIS POLICY WHICH IS EXCESS OVER THAT **UNDERLYING INSURANCE**. CAREFULLY REVIEW THE CLAIMS-MADE **UNDERLYING INSURANCE** AND THIS POLICY TO SEE HOW COVERAGE APPLIES.

A.    **SECTION I - INSURING AGREEMENT**, paragraph 1. COVERAGE - EXCESS LIABILITY replaced by the following:

1.    COVERAGE - EXCESS LIABILITY

**We** will indemnify the insured for **ultimate net loss** in excess of the total of the limits of **underlying insurance** that is covered by both the **controlling underlying policy** and this policy. **We** will not indemnify the insured, however, for any such **ultimate net loss** incurred in connection with any **event**, claim or suit that is subject to a sublimit in any **underlying insurance**.  Coverage under this policy will not attach until the limits of all **underlying insurance** have been paid in full and all such applicable limits of the **underlying insurance** have been exhausted.

If the **controlling underlying policy** requires, for a particular claim, that the **event** occur on or after the Retroactive Date shown in the Declarations of that insurance in order for that coverage to apply, then this policy will only apply to that **event** which occurs on or after the Retroactive Date shown in the SCHEDULE of this endorsement but before the end of the **POLICY PERIOD** of this policy.

However, as respects claims-made **underlying insurance**, this policy will only apply to **ultimate net loss** in excess of the claims-made **underlying insurance** scheduled on this endorsement, provided that:

a.    A claim is first made against any insured during the **POLICY PERIOD** of this policy or any extended reporting period provided under this policy;

b.    Should any applicable claims made **underlying insurance** require that a claim be reported to an underlying insurer in order to effect coverage, such claim must also be reported to **us** within the same reporting requirements as are required under such claims made **underlying insurance**;

c.    A **claim** is a result of an **event** that takes place on or after the RETROACTIVE DATE shown below.



The amount **we** will indemnify for **ultimate net loss** and pay **costs** is limited as described in **SECTION III - LIMIT OF INSURANCE.**

B.   The following section is added to this policy and applies only to claims-made coverage under this policy and provided under this endorsement:

**Extended Reporting Period**

If the claims-made **underlying insurance** scheduled on this endorsement has provided an extended reporting period, **we** will issue an endorsement providing an extended reporting period subject to the following conditions:

1.   **Our** extended reporting period will be for the lesser of:
   a.   Three (3) years; or
   b.   The same duration as the extended reporting period of such claims-made **underlying insurance**.

2.   The **First Named Insured** must make a written request to **us** for an extended reporting period within sixty (60) days after the end of the **POLICY PERIOD** shown in the **Declarations** of this policy or the cancellation date of this policy, whichever is first.

3.   **Our** extended reporting period will not take effect unless the additional premium determined by **us** is paid when due and an extended reporting period is purchased on the claims-made **underlying insurance**.  The premium for the extended reporting period will be fully earned when the extended reporting period takes effect.

4.   **Our** extended reporting period will only apply to an **event** to which this policy applies and which occurred:
   a.   On or after the RETROACTIVE DATE as shown below; but
   b.   Before the end of the **POLICY PERIOD** of this policy or the cancellation date, whichever comes first.

5.   **Our** extended reporting period will not reinstate or increase the Policy Aggregate Limit except to the extent provided for in the extended reporting period endorsement **we** issue.

6.   A claim first made during **our** extended reporting period will be deemed to have been made on the last day of the policy period of this policy or the cancellation date, whichever is first.

7.   a.   Subject to item 4 above, this policy's extended reporting period will only apply to those claims which are covered by the claims-made **underlying insurance** policy's extended reporting period; and
   b.   If the **underlying insurance** requires that a claim be reported to such underlying insurer in order to effect coverage, then **our** policy's extended reporting period will also incorporate those same claims reporting requirements.

C.   The SCHEDULE OF UNDERLYING INSURANCE is amended to include the following:



**SCHEDULE OF UNDERLYING INSURANCE**

The selected **CONTROLLING UNDERLYING POLICY** is indicated below by an "X"

A.    X    INSURANCE COMPANY:    Harleysville Worcester Insurance Company

COVERAGE:    Employee Benefits Liability (Claims Made)

LIMIT(S):    $1,000,000 each claim/
$2,000,000 aggregate

RETROACTIVE DATE:    08/14/2014

(If none, state None; if blank, the RETROACTIVE DATE will be the effective date of this endorsement.)

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

# GENERAL STAR INDEMNITY COMPANY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# GENERAL CHANGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**EXCESS LIABILITY POLICY**

In consideration of the premium charged, it is agreed that ITEM 1 - NAMED INSURED shown on the Declarations Page, is completed to add the following:

PARSONS TRANS, INC.
NASHVILLE LLC
PERFORMANCE TRUCK & TRAILER REPAIR CO.

This endorsement # 19, effective 03/01/2018 forms a part of Policy No. IXG927683A
issued to PERFORMANCE TRANS, INC. SEE FF001
by GENERAL STAR INDEMNITY COMPANY

| 03/06/2018 | Stamford, Connecticut | |
|---|---|---|
| Issue Date | Issued At | Authorized Signature |

# GENERAL STAR INDEMNITY COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SIGNATURE PAGE

IN WITNESS WHEREOF The **GENERAL STAR INDEMNITY COMPANY** has caused this Policy to be signed by its President and Secretary at Stamford, Connecticut.

GENERAL STAR INDEMNITY COMPANY

_____
Secretary

_____
President

SGN 90 0001 0710

# EXHIBIT B

**Britta O. Konopka, CPCU**
Vice President



Via Email & regular mail:
wrose@melicklaw.com

April 8, 2019

Mr. William P. Rose
Melick & Porter
One Liberty Square
Boston, MA 02109

Re: Insured: Performance Trans, Inc.
   D/L: 2/19/19
   Claim: G10048302

Dear Mr. Rose:

General Star Management Company, on behalf of General Star Indemnity Company,
acknowledges receipt of your letter of April 5, 2019 in connection with your representation of
Insurance Marketing Agencies, Inc. and its insurer, Utica Mutual Insurance Company. We
understand that they are seeking reconsideration of coverage under General Star Indemnity
Company's excess policy, IXG927683A, for damages related to a 2/19/19 single vehicle
collision, involving a rollover with resultant gasoline spill on Route 116 in North Salem, New
York.

As stated in our coverage position letter of March 14, 2019, General Star's policy is subject to
Endorsement #14, Exclusion – Total Pollution. At your request, we have reviewed Endorsement
#13, Special Hazards and Fluids Limitation Endorsement. We regretfully advise that this
endorsement does not extend coverage for the 2/19/19 vehicular accident. The circumstances of
this accident do not meet the definition of "Drilling Fluids Unloading Hazard" or "drilling
fluids" as defined by the policy.

Because other reasons may exist for which there is no potential for coverage under the Policy,
the reasons set forth in this letter for General Star's denial of coverage are not intended to be
exclusive and are based only on information available to General Star at the present time.

General Star reserves the right to rely upon any additional reasons to deny coverage, as
appropriate, in light of any new information provided to General Star. General Star also
specifically reserves the right to conduct an additional investigation or analysis of the claim if it
receives information which was not previously provided. Accordingly, no acts by any of General
Star's agents, attorneys, or employees are to be construed as a waiver or operate as an estoppel
with respect to any of General Star's rights under the Policy. In addition, no conduct of General

Page 2 of 2

Star or its employees, agents or attorneys is to be construed as a waiver or surrender of any term, condition, limitation, exclusion, or other provision of the Policy. Finally, General Star specifically reserves the right to resolve any coverage dispute or contract issue, if necessary, by filing an action for declaratory relief.

If you have any questions or comments concerning General Star's position, or if you have any information that would suggest that anything set forth in this letter is inaccurate, incorrect, or incomplete, please advise me immediately. General Star will consider any additional information you provide to ensure that Performance Trans Inc. is provided all benefits to which it is entitled, if any, under the Policy.

Very truly yours,

Britta O. Konopka, CPCU
203-328-5981
GENERAL STAR MANAGEMENT

Cc:

Kristen Gabor
Insurance Marketing Agencies, Inc.
klg@imaagency.com

Zac Taylor
zac@performancetransinc.com

Bill Zidelis – Mapfre
Szidelis@mapfreusa.com
File: RJMY75

# EXHIBIT C



Cara Tseng Duffield
202.719.7407
cduffield@wileyrein.com

May 23, 2019

**VIA EMAIL**

Erin K. Higgins
Conn Kavanaugh LLP
One Federal Street, 15th Floor
Boston, MA 02110
ehiggins@connkavanaugh.com

Re:     Insured:       Performance Trans, Inc.
        Policy No.:    IXG927683B (the "Policy")
        Claim No.:     G10048302
        Claim:         Date of Loss 2/19/19

Dear Ms. Higgins:

We represent General Star Indemnity Company ("General Star") in the above-referenced matter.  Please direct future correspondence on this matter intended for General Star to me with a copy to Britta Konopka at General Star.  On behalf of General Star, we write in response to your May 9, 2019 letter on behalf of Utica Mutual Insurance Company ("Utica").  After reviewing the information and arguments provided in Utica's May 9 letter, General Star respectfully reaffirms its March 14, 2019 denial of coverage based on the pollution exclusion in the Policy.

As set forth in General Star's and Utica's prior correspondence, on February 19, 2019, a Performance Trans, Inc. ("PTI") truck overturned in or around North Salem, New York, spilling fuel into the road and a nearby water reservoir.  PTI is seeking costs to clean up the spill.  We understand that the underlying insurer (Commerce Insurance Company) has paid the limits of its $1 million auto liability policy.

General Star received notice of the accident on or about March 13, 2019.  On March 14, General Star denied coverage based on the pollution exclusion contained in Endorsement 14 to the Policy (the "Pollution Exclusion").  On April 5, counsel for Insurance Marketing Agencies, Inc. ("IMA") sent a letter to General Star asking it to consider the impact of Endorsement 13, the Special Hazards and Fluids Limitation Endorsement ("Special Hazards Endorsement").  On April 8, General Star sent a letter stating the Special Hazards Endorsement does not apply to the accident.  On May 9, Utica sent a letter to General Star taking the position that PTI was transporting "drilling fluids," as that term is defined in the Special Hazards Endorsement, and the accident falls within an exception to the exclusion for Drilling Fluids Unloading Hazard.

Erin K. Higgins
May 23, 2019
Page 2

We understand that Utica does not dispute that, absent the Special Hazards Endorsement, the Pollution Exclusion would bar coverage for the accident.  The Pollution Exclusion precludes coverage for "any damages for which the insured is legally liable, or loss, costs or expenses, arising out of, resulting from, caused by or contributed to by" the "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time."  The exclusion also expressly bars coverage for "loss, costs or expense arising out of" any "[r]equest, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants."  "Pollutant" is defined in relevant part to mean "[a]ny solid, liquid, gaseous or thermal . . . contaminant." Given that the accident resulted in fuel spilling into a reservoir and surrounding land, and given that PTI seeks coverage for clean-up costs, the Pollution Exclusion squarely applies to the accident.

Utica nonetheless contends that the Policy affords coverage because (1) the accident falls inside the exception to the Drilling Fluids Unloading Hazard exclusion contained in the Special Hazards Endorsement; and (2) when the Special Hazards Endorsement (Endorsement 13) and Pollution Exclusion (Endorsement 14) are read together, Endorsement 13 either trumps the operation of Endorsement 14 or their interaction renders the Policy ambiguous.  General Star disagrees with both arguments.

First, General Star does not believe the Special Hazards Endorsement applies to the accident. The endorsement excludes coverage for "ultimate net loss or costs from any event arising out of, contributed by or relating to any Special Hazard described in this endorsement and resulting from the ownership, maintenance or use of any auto."  Drilling Fluids Unloading Hazard is a defined Special Hazard.  The endorsement contains an exception to the exclusion for an "event arising out of the unloading of drilling fluids" from a covered auto "if the unloading of drilling fluids resulted directly from" the upset or overturn of the auto.  "Drilling fluids" means "liquids which are used in or result from oil or gas drilling, extraction or recovery operations, regardless if the liquids contain gases, chemicals, solids, additives or proppants . . . ."

General Star denied coverage based on the Pollution Exclusion; it addressed the Special Hazard Endorsement at IMA's (and now Utica's) request.  General Star is not in possession of any information showing that the PTI truck at issue was involved in transporting substances to be used or that were used in oil or gas drilling, extraction or recovery operations.  General Star reserves all rights with respect to the operation of the Special Hazards Endorsement, including whether refined fuels constitute "drilling fluids."

Second, even if the accident did fall within the exception to the Drilling Fluids Unloading Hazard exclusion contained in the Special Hazards Endorsement, that fact would not change the application of the Pollution Exclusion to bar coverage.  General Star disagrees with Utica's

Erin K. Higgins
May 23, 2019
Page 3

statement that "Endorsement No. 13 provides that the Excess Policy will cover a spill involving drilling fluids, if the spill is covered by an underlying policy and the spill resulted from an upset or overturn of an insured vehicle, or a collision between the vehicle and another object."  May 9 letter at 4.  It is well-established that an exclusion cannot create coverage.  The exception to the Drilling Fluids Unloading Hazard exclusion only serves to narrow that exclusion under the specified circumstances.  As noted above, General Star did not deny coverage based on the Drilling Fluids Unloading Hazard exclusion.  It denied coverage under the Pollution Exclusion. Nothing in Endorsement 13 purports to apply to or override the separate Endorsement 14.  To the contrary, both endorsements state that "ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED."

Courts applying Massachusetts law have upheld the proposition that an exception to one exclusion does not negate the operation of a second applicable exclusion.  *See Certain Interested Underwriters at Lloyd's London v. Stolberg*, 680 F.3d 61, 67 (1st Cir. 2012) ("The appellant's suggestion that the Employees Exclusion should be read not to narrow coverage but to restore coverage depends on the curious notion that if the exclusion does not apply in a given situation, the policy must afford coverage for that situation.  Massachusetts case law runs to the contrary.  If one exclusion in an insurance policy leaves some hope for an exception, but that glimmer of hope is extinguished by another exclusion, there is no basis for a finding of coverage."); *Insituform Technologies, Inc. v. Am. Home Assurance Co.*, 566 F.3d 274, 279 (1st Cir. 2009) (savings clause may create an exception to the exclusions in the endorsement but does not "override exclusions contained elsewhere in the same policy").

General Star understands that Utica contends that the Pollution Exclusion essentially renders illusory the exception to the Drilling Fluids Unloading Hazard exclusion.  That the Pollution Exclusion applies to the instant claim does not render the Policy's coverage illusory.  Other claims may well fall within the exception to the Drilling Fluids Unloading Hazard exclusion that would not be excluded by the Pollution Exclusion (*e.g.*, where the "drilling fluids" being transported are not pollutants; or where no pollution results from the unloading of the drilling fluids).

For the foregoing reasons, the Policy does not afford coverage for the accident.  To the extent Utica would like to continue to pursue this matter, General Star would appreciate receiving the following information: information as to the beginning and destination points of the PTI truck at issue and the purpose of the trip; documentation showing the precise contents of the cargo; documentation showing the total amount incurred to date on clean-up costs and an estimate of future clean-up costs; information about any other potentially applicable coverage for PTI (other than the underlying policy and General Star Policy); a copy of the Utica policy; and information about any other potentially applicable coverage for IMA.

Erin K. Higgins
May 23, 2019
Page 4


Please feel free to contact me if you would like to discuss this matter.  General Star will consider any additional information that Utica wishes to provide.  Please note that nothing said or left unsaid in this letter is intended to be, or should be construed as, a waiver of any of General Star's rights.  General Star continues to reserve all rights under the Policy, at law and in equity.

Sincerely,

Cara Tseng Duffield


cc:     Britta Konopka/General Star
        Zac Taylor/Performance Trans
        William Rose/Melick & Porter
        Bill Zidelis/Mapfre