**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| PERFORMANCE TRANS, INC., and UTICA MUTUAL INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL STAR INDEMNITY COMPANY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)    No. 4:19-CV-40086<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT GENERAL STAR INDEMNITY COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT**

This case presents a straightforward dispute over contract interpretation. General Star

Indemnity Company ("General Star") issued an excess commercial general liability policy (the

"Policy") to Performance Trans, Inc. ("PTI"). On February 19, 2019, PTI's truck overturned,

spilling over 4,000 gallons of fuel oil onto the roadway and into a nearby drinking water

reservoir (the "Accident"). PTI has been working with state regulators to remediate the spill and

submitted a claim for cleanup costs to General Star. General Star denied coverage for the

Accident based the Total Pollution Exclusion in the Policy, which bars coverage for loss arising

out of any "request, demand or order" to "test for, monitor, clean up, remove, contain, treat,

detoxify, neutralize, or in any way respond to, or assess the effects of, pollutants."

After General Star denied coverage, PTI made a claim against its insurance broker,

Insurance Marketing Agencies, Inc. ("IMA"), alleging that IMA failed to procure proper

insurance coverage. IMA's malpractice carrier, Utica Mutual Insurance Company ("Utica"), has

agreed to advance cleanup costs to PTI on a conditional basis in exchange for PTI's cooperation in pursuing a claim against General Star.

Based on the undisputed facts and established law, General Star is entitled to summary judgment on all claims in this litigation:

- *First*, the Policy's Total Pollution Exclusion squarely bars coverage for the Accident. PTI and Utica attempt to create coverage by pointing to a separate policy provision, the Drilling Fluids Exclusion. However, the Drilling Fluids Exclusion cannot create coverage and does not affect the application of the Total Pollution Exclusion to the Accident.

- *Second*, PTI cannot prevail on its breach of contract claim. Not only is there no breach, since there is no coverage, but there are no damages. Utica has been advancing cleanup costs, and PTI cannot show that it has sustained damages from General Star's coverage denial.

- *Third*, Utica does not have a valid equitable subrogation claim against General Star. Utica has no basis to subrogate to the rights of PTI, which is not its insured.

- *Fourth*, General Star is not liable under Chapter 93A of the Massachusetts General Laws. General Star denied coverage based on the clear application of the Total Pollution Exclusion to an environmental pollution incident. PTI and Utica have no basis for contending that General Star engaged in the type of egregious conduct necessary to sustain a Chapter 93A claim.

Accordingly, General Star respectfully requests that the Court grant its motion for summary judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, General Star has filed a separate statement of undisputed material facts ("GSIC SOF") and exhibits attached to the Declaration of Cara Tseng Duffield ("Duffield Decl."). General Star incorporates its Rule 56.1 Statement of Facts herein.

## ARGUMENT

## I.   THE POLICY DOES NOT AFFORD COVERAGE FOR THE ACCIDENT

PTI and Utica cannot deny that the Accident fits squarely within the scope of the Policy's Total Pollution Exclusion.  Plaintiffs instead argue that the circumstances of the Accident fall within an exception to a different exclusion, the Drilling Fluids Exclusion, contained in a different endorsement, the Special Hazards and Fluids Limitation Endorsement.  As discussed below, the Drilling Fluids Exclusion does not create coverage and does not override the Total Pollution Exclusion.

### A.   The Total Pollution Exclusion bars coverage for the Accident.

The Total Pollution Exclusion unambiguously precludes coverage for the cleanup costs that PTI seeks.  The exclusion provides as follows:

### EXCLUSION – TOTAL POLLUTION

1. This policy does not apply to any damages for which the insured is legally liable, or loss, **costs** or expenses, arising out of, resulting from, caused by or contributed to by:

    a. The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants** at any time.

    b. Any loss, **costs** or expense arising out of any:

        (1) Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **pollutants**; or

        (2) Claim or suit by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of **pollutants**.

    Any actual or alleged: breach of duty, negligent act, error or omission, of any insured or of any person for whose acts any insured is legally liable which results in damages, loss, **costs** or expense as described in a. or b. above.

2. This policy does not apply to any damages for which the insured is legally liable, loss, **costs** or expenses arising out of, resulting from, caused by or

contributed to by **pollutants** regardless of whether the underlying insurance affords coverage for such damages, loss, **costs** or expenses.

**Pollutants** means:

(a)    Any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed; and

(b)    Any other substance defined as, treated as or considered to be **pollutants** by the **underlying insurance**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

Policy (Ex. 1 to Duffield Decl.), Endorsement 14.

Here, the PTI truck overturned and spilled fuel into a drinking water reservoir.  The spilled fuel constitutes a "pollutant," i.e., "any . . . liquid . . . contaminant."  PTI is seeking coverage for the costs to clean up the spill.  The Accident is a classic claim for environmental contamination barred by the Total Pollution Exclusion.  Courts applying Massachusetts law have upheld the application of total pollution exclusions under similar circumstances.  *See, e.g., McGregor v. Allamerica Ins. Co.*, 868 N.E.2d 1225 (Mass. 2007) (pollution exclusion bars coverage for ground contamination by leak of home heating oil); *Dryden Oil Co. of New England v. Travelers Indem.*, 91 F.3d 278 (1st Cir. 1996) (no coverage under liability policy as a matter of law for cleanup of oil and industrial lubricants); *Nascimento v. Preferred Mut. Ins. Co.*, 478 F. Supp. 2d 143, 148 (D. Mass. 2007) (holding pollution exclusion bars coverage for cleanup of oil leak and collecting Massachusetts cases holding same).

B.    **The Drilling Fluids Exclusion does not create coverage or override the Total Pollution Exclusion.**

Neither PTI nor Utica has ever articulated any reason why the Total Pollution Exclusion, standing alone, would not bar coverage for the Accident.  Rather, PTI and Utica argue that an exception within a different policy exclusion creates coverage.

The Policy includes a "Special Hazards and Fluids Limitation Endorsement," which bars coverage for loss or costs involving any of several "Special Hazards" and "resulting from the ownership, maintenance or use of any auto."  Policy (Ex. 1 to Duffield Decl.), Endorsement 13. One of the Special Hazards for which coverage is excluded is the Drilling Fluids Unloading Hazard (the "Drilling Fluids Exclusion").  "Drilling fluids" are specialized fluids used to assist in drilling for oil and other natural resources.[1]  The term "drilling fluids" is defined in the Policy as "liquids which are used in or result from oil or gas drilling, extraction or recovery operations, regardless if the liquids contain gases, chemicals, solids, additives or proppants.  Such liquids include, but are not limited to, flowback water, brine water, hydraulic fracturing fluids, lubricants or slippery water.  Drinking quality water does not fall within this definition."  *Id.*, Endorsement 13.

The Drilling Fluids Exclusion precludes coverage for loss or costs arising out of the "unloading of drilling fluids from any auto, mobile equipment, machinery or equipment, whether unloading is the result of movement of property by a mechanical device, an accident, a spill or otherwise." There is, however, a limited exception to the Drilling Fluids Exclusion as follows:

> However, this exclusion does not apply to an **event** arising out of the unloading of **drilling fluids** from an auto covered by this policy and covered by the **controlling underlying insurance** for the total limits of the **underlying insurance**, if the unloading of **drilling fluids** resulted directly from any of the following:
>
> 1. Heat, smoke or fumes from a **hostile fire**;
> 2. Upset or overturn of such auto;
> 3. A collision between such auto being used in your business and another object; or
> 4. A **short term drilling fluid event** . . .
>
> ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED.

---

[1]     Schlumberger Oilfield Glossary, https://www.glossary.oilfield.slb.com/en/Terms/d/drilling_fluid.aspx

*Id.*, Endorsement 13.

Utica and PTI argue that the limited exceptions to the Drilling Fluids Exclusion should be read to create coverage in this case, because (i) the case involves the "upset or overturn" of an "auto" within the meaning of subparagraph 2 of the exception; (ii) the "upset or overturn" resulted "directly" in the "unloading" of fuel oil, which the Policy says can occur through an "accident" or a "spill"; (iii) the fuel oil spilled by the PTI truck meets the definition of "drilling fluids" in the Drilling Fluids Exclusion; and (iv) since the Policy says that the Drilling Fluids Exclusion "does not apply" to "unloading of drilling fluids from an auto... result[ing] directly from... upset or overturn of [an] auto," this must also mean that no other exclusion can apply to such an accident, and there must be coverage.

Even if one assumes that the premises of Utica and PTI's argument are correct, the conclusion is wrong.[2]  Massachusetts courts and the First Circuit (applying Massachusetts law) have firmly rejected the proposition that an exception to an exclusion creates coverage in the first instance.

First, the Drilling Fluids Exclusion is an exclusion.  The fact that the exclusion contains a limited exception for "unloading of drilling fluids" resulting directly from the "upset or overturn" of an auto does not mean that the Policy affirmatively promises to insure the unloading of drilling fluids resulting from the upset or overturn of an auto.  An exception to an exclusion is not an insuring agreement or coverage grant.  Rather, an exception to an exclusion simply narrows the scope of the subject exclusion.  It does not create coverage in the first instance.  *See Donovan v. Commercial Union Ins. Co.*, 692 N.E.2d 536, 540 (Mass. App. Ct. 1998) ("exclusion

---

[2]     Read as a whole, the Policy's "drilling fluids" definition shows that "drilling fluids" are those substances that are used to extract oil and gas, including liquid waste byproducts from extraction operations, but not the oil and gas that are themselves the target of the extraction.  Regardless, even if PTI was transporting "drilling fluids," the Total Pollution Exclusion still bars coverage.

clauses subtract from coverage rather than grant it"); *Spurlin v. Merchants Ins. Co.*, 57 F.3d 9, 11 (1st Cir. 1995) ("Nor do exclusions themselves create coverage"); *Am. Home Assurance Co. v. AGM Marine Contractors, Inc.*, 379 F. Supp. 2d 134, 137-38 (D. Mass. 2005) (the "subcontractor exception to the [subject] exclusion cannot create coverage where . . . none exists").

Second, nothing in the Policy suggests that the Drilling Fluids Exclusion was intended to override the Total Pollution Exclusion.  The endorsements have the same effective date.  The endorsements do not reference each other.  To the contrary, each endorsement states that "ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS OF THIS POLICY REMAIN UNCHANGED."  Thus, even if the Drilling Fluids Exclusion does not bar coverage for the Accident, other exclusions, like the Total Pollution Exclusion, may preclude coverage.  *See Certain Interested Underwriters at Lloyd's London v. Stolberg*, 680 F.3d 61, 67 (1st Cir. 2012) ("If one exclusion in an insurance policy leaves some hope for an exception, but that glimmer of hope is extinguished by another exclusion, there is no basis for a finding of coverage"); *Insituform Technologies, Inc. v. Am. Home Assurance Co.*, 566 F.3d 274, 279 (1st Cir. 2009) (savings clause created an exception to the exclusions in the endorsement but did not "override exclusions contained elsewhere in the same policy"); *Bond Bros. v. Robinson*, 471 N.E.2d 1332, 1334 (Mass. 1984) ("We flatly reject the concept that" an exception to one exclusion "creates an ambiguity, or an objectively reasonable expectation of coverage" when "another explicit exclusion" applies); *Donovan*, 692 N.E.2d at 540 ("The notion, however, that if the exclusion is read so as not to extend to such cases, insurance coverage affirmatively and automatically follows, is not self-proving and would seem to be in the teeth of the basic principle that exclusion clauses subtract from coverage rather than grant it").

Established canons of contract interpretation dictate that insurance policy provisions should be read give effect to all provisions rather than render any provision superfluous. *See, e.g., In re New Seabury Ltd. P'ship*, 450 F.3d 24, 36 (1st Cir. 2006) ("every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible"). PTI and Utica's insistence that the Court simply ignore the Total Pollution Exclusion flies in the face of this black-letter law.

Third, it is true that in some cases a policy may be found ambiguous if it contains two equally specific provisions, where one seems to grant coverage while the other seems to take the coverage away entirely. But here, PTI and Utica cannot show that the Total Pollution Exclusion renders coverage illusory. There are numerous types of claims that would fall within the "upset and overturn" exception to the Drilling Fluids Exclusion and to which the Total Pollution Exclusion would not apply. Examples of such claims include at least the following:

**1.      Cases in which the "drilling fluids" at issue are not pollutants**.

"Drilling fluids" under the Special Hazards Endorsement encompass a variety of substances, including "flowback water, brine water, hydraulic fracturing fluids, lubricants or slippery water." Policy, End. 13. Not all "drilling fluids" are necessarily toxic or even hazardous. Fresh or salt water is a significant, if not the largest, component of many drilling fluids.[3] Even after drilling, so-called "produced water," or water found in or near gas-bearing layers that are the target of gas drilling operations, may contain few or no contaminants. In some states, produced water may be used for irrigation purposes or is permitted to be discharged directly into surface waters. *See generally* 40 C.F.R. § 435.50 et seq.; 40 C.F.R. § 435.51(c) ("produced water [] of good enough quality to be used for wildlife or livestock watering or other

---

[3]      USEPA, Management of Exploration, Development and Production Wastes: Factors Informing a Decision on the Need for Regulatory Action at 3-3 (April 2019) (attached as Exhibit 11 to Duffield Decl.).

agricultural uses"); 40 C.F.R. § 435.52 (limits on discharge of produced water into navigable

waters).  Still other states allow drilling fluids to be used as a road base, for de-icing purposes, or

as a roadway dust-suppressant.[4]  Spills of drilling fluids that are not pollutants would not

implicate the Total Pollution Exclusion.

2.　　**Cases in which the "drilling fluids" might be pollutants in the abstract but do**

**not actually pollute anything**.  The Total Pollution Exclusion bars coverage for loss arising out

of pollutants, defined in relevant part as "irritants" or "contaminants."  The exclusion applies

where pollutants pollute (*i.e.*, irritate or contaminate) something.  A "drilling fluid" that could

constitute a pollutant in some circumstances may not be a pollutant in other circumstances.  Even

the spill of a toxic substance that does not seep into the soil or groundwater may not be deemed

pollution within the scope of the Total Pollution Exclusion.  *See, e.g., W. Alliance Ins. Co. v.*

*Gill*, 686 N.E.2d 997, 999 (Mass. 1997) (pollution exclusion barred coverage for environmental

contamination but not necessarily for accidents occurring in normal business circumstances); *Atl.*

*Mut. Ins. Co. v. McFadden*, 595 N.E. 2d 762, 764 (Mass. 1992) (same); *Feinberg v. Commercial*

*Union Ins. Co*., 766 N.E.2d 888, 893 (Mass. App. Ct. 2002) (pollution exclusion applied because

insured's liability "arises out of the release of specific chemicals into the soil and groundwater"

even though "stockpiled rubber materials might be useful products"); *Dryden Oil Co.*, 91 F.3d at

283 (pollution exclusion applied to environmental contamination even if substances at issue

might not "necessarily constitute pollutants in all forms and circumstances").

3.　　**Cases in which the damages claimed as a result of an "upset or overturn"**

**accident are from bodily injury or property damage unrelated to any pollution**.  Bodily

---

[4]　　USEPA, Study of Oil and Gas Extraction Wastewater Management Under the Clean Water Act, EPA-821-R19-001 at 7-8 (Draft, May 2019) (attached as Ex. 12 to Duffield Decl.); USEPA, Management of Exploration, Development and Production Wastes: Factors Informing a Decision on the Need for Regulatory Action at 4-11, 6-22 (April 2019) (attached as Ex. 11 to Duffield Decl.).

injury or property damage may result from the unloading of "drilling fluids" from an auto

independent of any pollution.  Persons may sustain bodily injury in connection with the upset or

overturn of a vehicle that results in a spill of "drilling fluids" where the bodily injury has nothing

whatsoever to do with pollution—for instance, injury to the driver of the vehicle or other drivers

on the roadway.  Likewise, the spill of "drilling fluids" could render tangible property unusable

even though no pollution results from the accident.  These claims would potentially fall within

the exception to the Drilling Fluids Exclusion and not be excluded by the Total Pollution

Exclusion.  *See, e.g., Utica Mutual Insurance Co. v. Hall Equipment, Inc. et al.*, 73 F.Sup.2d 83,

87 (D. Mass 1999) (pollution exclusion barred coverage for cleanup costs but not for non-

remediation costs such as permanent property damage and diminution in fair market value),

*aff'd*, 292 F.3d 77 (1st Cir. 2002).

Given the various types of coverage that remain, PTI and Utica cannot show that the

Total Pollution Exclusion renders illusory the exception to the Drilling Fluids Exclusion.  *See*

*Bagley v. Monticello Ins. Co.*, 720 N.E.2d 813, 817 (Mass. 1999) (as long as "the policy still

provides coverage for some acts, it is not illusory simply because of a potentially wide

exclusion"); *Saint Consulting Group, Inc. v. Endurance Am. Specialty Ins. Co.*, 699 F.3d 544,

553 (1st Cir. 2012) ("That the exclusion substantially reduces coverage does not in any way

make the policy illusory under contract law since it still provides coverage for many potential

claims"); *B&T Masonry Construction Co., Inc. v. Public Service Mut. Ins. Co.*, 382 F.3d 36, 41

(1st Cir. 2004) (no illusory coverage; while "these exclusions do limit liability, they do not

completely vitiate the bargained-for coverage").

## II.     PLAINTIFFS HAVE NO BREACH OF CONTRACT DAMAGES

PTI cannot state a claim for breach of contract.  It is well-established that, in order to

prevail on a breach of contract claim, a party must show some harm and damages resulting from

the breach.  *Geis v. Nestle Waters N. Am. Inc.*, 321 F. Supp. 3d 230, 243 (D. Mass 2018).  PTI

has not shown that it has any sustained any such harm or damages as a result of General Star's

alleged breach of contract.  To the contrary, the record evidence shows that, after MAPFRE

exhausted the limits of its policy, Utica agreed to pay the next $1 million of clean-up costs from

the Accident.  GSIC SOF ¶¶ 19-20; Ex. 3 to Duffield Decl.

Utica similarly cannot state a claim for breach of contract.  Utica seeks to bring a breach

of contract claim against General Star as PTI's assignee for the $1 million that it has agreed to

advance to PTI.  However, PTI's attempted assignment of rights is invalid.  Section 12 of the

Policy provides as follows:

> TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY
>
> Your rights and duties under this policy may not be transferred without our
> written consent.

General Star did not give written consent for any transfer of rights under the Policy.

Massachusetts courts enforce anti-assignment provisions.  In *Pennsylvania Millers Mut.*

*Ins. v. Commerce Ins. Co.*, 8 Mass. L. Rptr. 74 (Mass. Super. Ct. 1998), a building was damaged

when a firecracker was thrown through the window.  The building insurer paid the damage and

sued the store that sold the fireworks.  The store tendered the claim under its businessowners

policy.  That store's insurer denied coverage.  After the building insurer obtained a judgment

against the store, the store assigned its rights under the businessowners policy to the building

insurer, which sued the store's insurer.  The court held that an anti-assignment provision in the

businessowners policy barred coverage.  Similarly, in *City of Hope National Medical Center v.*

*HealthPlus, Inc.*, 156 F.3d 223 (1st Cir. 1998), a patient received medical treatment.  Her health

insurer denied coverage because she failed to obtain pre-authorization for the services.  She

assigned her rights under her policy to the healthcare provider, who sued the insurer.  The court

granted judgment for the insurer on the basis of an anti-assignment clause.

Moreover, even if Utica did have a valid assignment from PTI, Utica could not

demonstrate damages in its capacity as PTI's assignee.  It is well-established that an assignee

stands in the shoes of the assignor, and its rights are no greater than that of the assignor.

*Drakopoulos v. U.S. Bank Nat'l Ass'n*, 991 N.E.2d 1086, 1095 n.16 (Mass. 2013) (assignee

"stands in no better position than the assignor, and any defense which the defendant could raise

against the latter may also be raised against the former").  As noted above, PTI cannot

demonstrate breach of contract damages because PTI's primary CGL carrier and Utica have paid

all cleanup costs to date.  In its capacity as PTI's assignee, Utica cannot substitute its own

claimed damages (*i.e.*, the Conditional Indemnity Amount) for PTI's lack of damages.  Utica's

breach of contract claim therefore also fails.

## III.   UTICA CANNOT STATE A CLAIM FOR EQUITABLE SUBROGATION

Utica also cannot pursue General Star under an equitable subrogation theory.  Under

Massachusetts law, an insurer that pays a loss on behalf of its insured may be equitably

subrogated to any rights of recovery that its insured has against a third party.  Here, Utica does

not seek to be subrogated to the right of its own insured, and it is not seeking recovery of any

amounts owed to its insured.  Rather, Utica is seeking to enforce PTI's contractual rights against

General Star even though Utica is a complete stranger to that relationship.

After General Star denied coverage, PTI made a claim against its broker, IMA, for failing

to procure proper insurance coverage.  IMA's malpractice insurer, Utica, then entered into a

Conditional Indemnification Agreement with PTI.  *See* Ex. 3 to Duffield Decl.  Utica agreed to

"conditionally indemnify" PTI for up to $1 million in cleanup costs for the Accident.  The

agreement recites that the "conditional indemnification" is a "preliminary measure [] while Utica

is concluding its investigation of Performance's claims against IMA and the potential liability of

others for the costs of the cleanup." Conditional Indemnity Agreement ¶ 1. The agreement

expressly does not include a release of liability for IMA. *Id*. ¶ 5 (conditional indemnity payment

"shall not constitute an accord and satisfaction or release of Performance's claims, defenses, or

causes of action, known or unknown, against Utica and/or IMA").

These circumstances fall outside the parameters of an equitable subrogation claim. "The

doctrine of subrogation applies … to payments under policies of insurance. Upon payment, the

insurer is entitled to share the benefit of any rights of recovery the insured may have against a

tortfeasor for the same loss covered by the insurance." *Frost v. Porter Leasing Corp.*, 436

N.E.2d 387, 389 (Mass. 1982). Equitable subrogation "entitles an insurer who indemnifies its

insured against a loss to recover that expense against the party primarily responsible for the

loss." *Specialty Nat. Ins. Co. v. OneBeacon Ins. Co.*, 486 F.3d 727, 731 n.4 (1st Cir. 2007). *See*

*also St. Paul Fire & Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP*, 379 F. Supp. 2d

183, 192 (D. Mass. 2005) ("Under Massachusetts law, the doctrine of subrogation provides that

'[w]hen an insurer pays an insured's claim under its insurance contract, the insurer succeeds to

any right of action the insured may have against the parties allegedly responsible for the loss.'").

Utica does not satisfy these requirements. Utica has not paid any loss on behalf of its

own insured, IMA. Rather, it has directly indemnified PTI on a conditional and preliminary

basis without obtaining a release for IMA. The Conditional Indemnity Agreement does not

specify that Utica even has paid the Conditional Indemnity Amount under the malpractice policy

it issued to IMA. Utica is not attempting to enforce the rights of its insured (IMA); it is

attempting to enforce PTI's rights. While Massachusetts has recognized a cause of action for

equitable contribution among insurers, that claim arises only when insurers "afford coverage for

the same insureds and the same risk." *U.S. Fire Ins. Co. v. Peerless Ins. Co.*, No. 00-5595, 2001 WL 1688368, at *5 (Mass. Super. Dec. 20, 2001).  Utica and General Star do not insure the same risk.  To the contrary, the risks they insure are mutually exclusive:  if the Policy affords coverage for the Accident, then PTI has no claim for malpractice against IMA.  Conversely, if PTI failed to procure proper coverage, the Policy by definition does not cover the Accident.

The Court accordingly should reject Utica's novel attempt to create equitable subrogation rights where none exist.

## IV.   GENERAL STAR IS NOT LIABLE UNDER CHAPTER 93A

PTI and Utica's claim that General Star violated Chapter 93A of the Massachusetts General Laws should be dismissed.  As an initial matter, plaintiffs cannot prevail on their Chapter 93A claims because General Star did not breach the Policy (*see* Section I) and PTI has not suffered any damages (*see* Section II).  But even if the Court finds that the Policy covers the Accident and that PTI has suffered damages, the Chapter 93A claim is still deficient as a matter of law.

First, it is well-established that "mere breaches of contract, without more, do not violate chapter 93A."  *Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985) (citing *Whitinsville Plaza, Inc. v. Kotseas*, 390 N.E.2d 243, 251 (Mass. 1979)); *see also Framingham Auto Sales, Inc. v. Workers Credit Union*, 671 N.E.2d 963, 965 (Mass. 1996) ("mere breach of a legal obligation under commercial law, without more, does not amount to an unfair or deceptive act under G.L. c. 93A").  Here, General Star denied coverage on the basis that the Total Pollution Exclusion bars coverage for the Accident, a position that is at least reasonable on its face.  *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir. 1998) (no Chapter 93A liability "[w]here there is a good faith dispute over whether payment is actually owed, and that dispute is clearly articulated"); *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 916

(Mass. 1992) (reasonable coverage position, even if incorrect, does not subject insurer to Chapter 93A liability).

Second, PTI and Utica's attempts to dress up a simple breach of contract as a claim for unfair or deceptive practices fail. Plaintiffs allege that General Star violated Chapter 93A by "failing to indemnify PTI under the [Policy], failing to provide a reasonable explanation for denying coverage under the [Policy], ignoring or misstating pertinent language of the Policy in relaying its coverage determinations, and failing to effectuate a prompt, fair, and equitable settlement of PTI's claim." Compl. ¶ 49. PTI and Utica cannot prevail simply by reciting alleged unfair settlement practices under Chapter 176D. Violations of Chapter 176D are not proof of violations of Section 11 of Chapter 93A. *Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co.*, 802 F.3d 39, 54-55 (1st Cir. 2015). Rather, the challenged misconduct must rise to the level of an "extreme or egregious" business wrong, "commercial extortion," or similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce." *Id*. at 54; *see also Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014). PTI and Utica have adduced no facts to demonstrate that General Star acted egregiously as required by Chapter 93A.

Third, the undisputed summary judgment record shows that General Star has been prompt and responsive in communicating with PTI and Utica and has taken active steps to attempt to resolve the parties' dispute, even despite its good-faith coverage denial. General Star promptly issued its coverage denial and timely responded to each of PTI and Utica's requests for reconsideration. GSIC SOF ¶¶ 12-18, 21. Its coverage positions explained the basis for asserting the Total Pollution Exclusion as a bar to coverage. *Id*. ¶¶ 13, 21; Exs. 2, 4 to Duffield Decl. General Star also has taken active steps to resolve the dispute and has made multiple

good-faith settlement offers.  GSIC SOF ¶¶ 22-23, 25; 26, 28, 30; Exs. 7, 8, 10 to Duffield Decl.

*See Peabody Essex Museum,* 802 F.3d at 55 (insurer's attempts to resolve dispute negated

Chapter 93A liability).

In sum, General Star's coverage position was eminently reasonable and PTI and Utica

can point to no facts in the summary judgment record that show that General Star acted in the

egregious manner necessary to support liability under Section 11 of Chapter 93A.

## V.      PLAINTIFFS ARE NOT ENTITLED TO ATTORNEYS' FEES FOR THIS LAWSUIT

In their Complaint, Plaintiffs seek attorneys' fees incurred in this coverage action.  In

general, Massachusetts follow the "American Rule," where successful litigants are not permitted

to recover litigation fees and costs from their opponents.  *Preferred Mut. Ins. Co. v. Gamache*,

686 N.E.2d 989, 991 (Mass. 1997).  In *Gamache*, the Supreme Judicial Court of Massachusetts

recognized a limited exception that allows insureds to recover reasonable attorney's fees and

costs incurred to establish an insurer's duty to defend.  *Id*. at 993.

The *Gamache* exception does not apply to this case.  First, PTI is not seeking to establish

any duty to defend.  Rather, PTI's claim at all times has been for indemnity in the form of

cleanup costs.  *See* Compl., Introduction at 2 (PTI seeks "a declaration that General Star is

obligated to indemnify PTI for the losses arising out of the accident"); Request for Relief at 10

(seeking same).  Indeed, the Policy is not a duty to defend policy and expressly states, "We will

not be obligated to investigate, defend or settle any claim or suit against the insured."  Policy,

Section II.1.  Massachusetts has declined to extend the *Gamache* exception to cases involving

only the duty to indemnify.  *Wilkinson v. Citation Ins. Co.*, 856 N.E.2d 829, 835 (Mass. 2006)

("we now expressly limit the *Gamache* exception to duty to defend litigation").

Second, the *Gamache* exception allows policyholders to obtain their attorney's fees and costs, but not insurers—even those insurers who sue under an equitable subrogation theory to enforce a policyholder's rights against another insurer. *John T. Callahan & Sons, Inc. v. Worcester Ins. Co.*, 902 N.E.2d 923, 924 (Mass. 2009) (*Gamache* exception "does not extend to allow the prevailing insurer recovery of its attorney's fees associated with an action brought to establish the defense and coverage responsibility of another insurer").  For this additional reason, Utica is not entitled to recover its attorney's fees.

## CONCLUSION

For the reasons set forth above, General Star Indemnity Company respectfully requests that the Court grant its motion for summary judgment.

Date:  August 19, 2019

Respectfully submitted,

/s/  William L. Boesch
William L. Boesch
Sugarman Rogers Barshak & Cohen, P.C.
101 Merrimac Street
Boston, MA 02114
617-227-3030
boesch@sugarmanrogers.com

Cara Tseng Duffield
(*pro hac vice* application pending)
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7407
cduffield@wileyrein.com

*Counsel for Defendant and Counterclaim Plaintiff General Star Indemnity Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2019, I caused to be served via ECF the foregoing

Memorandum in Support of Motion for Summary Judgment on counsel of record.


/s/  William L. Boesch