# United States Court of Appeals
## For the First Circuit

No. 20-1022

PERFORMANCE TRANS., INC.; UTICA MUTUAL INSURANCE COMPANY,

Plaintiffs, Appellants,

v.

GENERAL STAR INDEMNITY COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Syed S. Ahmad, with whom David M. Parker, Hunton Andrews Kurth LLP, Jared A. Fiore, Douglas T. Radigan, and Bowditch & Dewey, LLP were on brief, for appellants.
Cara Tseng Duffield, with whom Hume M. Ross and Wiley Rein LLP were on brief, for appellee.

December 18, 2020

      **LYNCH**, **Circuit Judge**.  Performance Trans., Inc. and Utica Mutual Insurance Company (collectively "PTI") brought this Massachusetts breach of contract and unfair and deceptive insurance practices action under Mass. Gen. Laws ch. 93A, § 11 against PTI's excess insurer, General Star Indemnity Company. After the parties cross-moved for summary judgment, the district court granted summary judgment in General Star's favor on the breach of contract claim, finding the relevant excess policy provisions unambiguously excluded coverage.  Finding the excess policy ambiguous, we reverse and order entry of judgment in favor of PTI on the Massachusetts breach of contract claim, and we dismiss the 93A claim.

I.

A. Facts.

      PTI, a Massachusetts corporation, transports commodities, including petroleum products.  As a commercial transporter of petroleum products, it obtained insurance coverage. On February 19, 2019 a PTI tanker-truck overturned in North Salem, New York "spilling approximately 4,300 gallons of gasoline, diesel fuel, and dyed diesel fuel onto the roadway and [into a] nearby reservoir."  Remediation work, which counsel for PTI states has cost almost $3,000,000 to date, has been undertaken by the New York State Department of Environmental Conservation and PTI.

At the time of the accident PTI held approximately $1,000,000 in primary insurance coverage for its shipping operations. It is undisputed that the primary insurance covers this incident, including the cleanup costs.

The insurance policy at issue here is the excess liability policy covering the period of March 2018 to March 2019. The policy provided an aggregate of $5,000,000 in coverage beyond the coverage limit on PTI's primary insurance. Nothing in the record establishes that all terms of this excess policy were standard form insurance contracts.

The policy stated "[General Star] will indemnify the insured for <u>ultimate net loss</u> in excess of the total of the limits of underlying insurance that is covered by both the <u>controlling underlying policy</u> and this policy." And "[e]xcept for the express provisions of this policy, this policy will follow the provisions, conditions, exclusions and limitations of the <u>controlling underlying policy</u>."

The excess policy also contained twenty riders. Out of these twenty riders, fifteen are labeled exclusions. One such exclusion is in Endorsement 14, titled "Exclusion -- Total Pollution," which states:

> This policy does not apply to any damages for which the insured is legally liable, or loss, costs or expenses arising out of, resulting from, caused by or contributed to by . . . [t]he actual, alleged or threatened discharge,

dispersal, seepage, migration, release or
escape of pollutants at any time . . . [or
any] [r]equest, demand, or order that any
insured or others test for, monitor, clean up,
remove, contain, treat, detoxify or
neutralize, or in any way respond to, or
assess the effects of pollutants. . . . This
policy does not apply to damages . . . caused
by . . . pollutants regardless of whether the
underlying insurance affords coverage for such
damages . . . .

There is another endorsement, Endorsement 13, which is

not one of the named exclusions. It is rather titled "Special

Hazards and Fluids Limitation Endorsement." It states:

This policy does not apply to ultimate net
loss or costs from any event arising out of,
contributed by or relating to any Special
Hazard described in this endorsement and
resulting from the ownership, maintenance or
use of any auto. Special Hazards: A. Radiation
Hazard[;] B. Underground Hazard[;] C. Drilling
Fluids Unloading Hazard[.] However, this
exclusion does not apply to an event arising
out of the unloading of drilling fluids from
an auto covered by this policy and covered by
the controlling underlying insurance for the
total limits of the underlying insurance, if
the unloading of drilling fluids resulted
directly from any of the following: 1. Heat,
smoke or fumes from a hostile fire; 2. Upset
or overturn of such auto; 3. A collision
between such auto being used in your business
and another object; or 4. A short term
drilling fluid event, provided that coverage
under this item 4: a. Will be available to
bodily injury or property damage, but not
damage to real property or to a body of water
or to any other natural resource; and b. Will
not be available unless written notice of the
short term drilling fluid event is given to us
or the controlling underlying insurance
company as soon as practicable, but no more
than thirty (30) days after the shipment of

the drilling fluids was entrusted to your
care. If any other limit, such as a sublimit,
is specified in the underlying insurance, then
paragraphs 1. and 2. above will not apply
unless that limit is specified in the SCHEDULE
OF UNDERLYING INSURANCE.

The Endorsement also specially defines a number of terms, including
"drilling fluids unloading hazard." The parties agree for purposes
of appeal that the February 19, 2019 accident falls under the
second exception for upset or overturn of an auto.

On March 13, 2019, after cleanup costs exceeded PTI's
$1,000,000 primary insurance limit, PTI made a claim with General
Star under the excess liability policy. General Star disclaimed
any coverage obligation on the basis of the Total Pollution
Exclusion. PTI then contacted its insurance agent, Insurance
Marketing Agency, who requested General Star reconsider the denial
in light of the Special Hazards Endorsement. General Star again
disclaimed any coverage, saying the Total Pollution Exclusion
barred coverage, and in any event the fuel spill did not qualify
as a "drilling fluids unloading hazard." General Star now accepts
for purposes of appeal that the February 19, 2019 accident falls
under the Drilling Fluids Unloading Hazards item in Endorsement
13.

Utica then issued PTI provisional coverage of up to
$1,000,000 on condition that PTI assigned Utica its right to
recover up to that amount from General Star. Utica again asked

General Star to reconsider its coverage disclaimer.[1]  When General Star disclaimed any coverage obligation for the third time, PTI and Utica brought this suit.

B.  Relevant Procedural History.

Both parties agreed there were no genuine questions of material fact, and the policy interpretation could be decided as a pure question of law.  The district court entered summary judgment in favor of General Star on all counts.

Both before the district court and on appeal General Star argues "the [February 19, 2019] [a]ccident is a classic claim for environmental contamination barred by the Total Pollution Exclusion."  PTI argues that there was coverage under the Special Hazards Endorsement, or at least the policy was ambiguous, and all ambiguity must be construed against the insurer.

The district court found the policy unambiguous and characterized the Special Hazards Endorsement as an exclusion with an exception.  It read Massachusetts law to create a per se rule that "if the Total Pollution Exclusion bars coverage for the [a]ccident, the Special Hazards and Fluids Limitation Endorsement cannot create ambiguity."  The district court granted summary

---

[1]  In parallel, on March 15, 2019, PTI asked General Star to narrow the Total Pollution Exclusion in exchange for a premium increase.

judgment in favor of General Star on the Massachusetts breach of
contract claim, and dismissed the 93A, § 11 claim with prejudice.

                                    II.

A. Legal Standard.

        We review both the district court's grant of summary
judgment and its interpretation of the contract de novo, "drawing
all reasonable inferences in favor of the non-moving party." Pac.
Indem. Co. v. Deming, 828 F.3d 19, 23 (1st Cir. 2016) (quoting
Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d
78, 89 (1st Cir. 2013)); see also Dukes Bridge LLC v. Beinhocker,
856 F.3d 186, 189 (1st Cir. 2017).  It is undisputed Massachusetts
law applies to the contract-law issues in this case.  See Dukes
Bridge LLC, 856 F.3d at 189.

B. Analysis.

        Massachusetts courts look to "what an objectively
reasonable insured, reading the relevant policy language, would
expect to be covered." Dorchester Mut. Ins. Co. v. Krusell, 150
N.E.3d 731, 738 (Mass. 2020) (internal quotation marks and
citations omitted).  We must "interpret the words 'in light of
their plain meaning, . . . giving full effect to the document as
a whole.'"  Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc.,
106 N.E.3d 572, 577 (Mass. 2018) (quoting Golchin v. Liberty Mut.
Ins. Co., 993 N.E.2d. 684, 688 (Mass. 2013)) (alterations in
original).

Under Massachusetts law, a policy term is ambiguous when "reasonably intelligent persons would differ" as to the proper meaning of the term.  Dorchester Mut. Ins. Co., 150 N.E.3d at 738 (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 952 (Mass. 1998)).  "Ambiguity does not exist simply because the parties disagree about the proper interpretation of a policy provision; rather[] '[a]mbiguity exists when the policy language is susceptible to more than one rational interpretation.'"  Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012) (quoting Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4-5 (1st Cir. 2000) (alteration in original)).  We must construe any ambiguity in the policy in favor of the insured. Metro. Prop. & Cas. Ins. Co. v. Morrison, 951 N.E.2d 662, 671 (Mass. 2011).

Massachusetts courts further construe policy exclusions strictly against the insurer.  Green Mountain Ins. Co., Inc. v. Wakelin, 140 N.E.3d 418, 427 (Mass. 2020) (applying the "long-standing    principle    of strictly construing exclusions from coverage against the insurer"); City Fuel Corp. v. Nat'l Fire Ins. Co. of Hartford, 846 N.E.2d 775, 779 (Mass. 2006) (noting "the strict construction we normally afford exclusionary clauses, particularly where there is any ambiguity").  Under Massachusetts law, courts should err on the side of the narrowest plausible interpretation of the exclusion and resolve doubts about the scope

of an exclusion in favor of the insured.  Hakim v. Mass. Insurers' Insolvency Fund, 675 N.E.2d 1161, 1165 (Mass. 1997) (the rule of construction that any ambiguity must be resolved in favor of the insured "applies with particular force to exclusionary provisions"); Vappi & Co., Inc. v. Aetna Cas. & Sur. Co., 204 N.E.2d 273, 276 (Mass. 1965) ("[A]mbiguity in . . . somewhat complicated exclusions must be construed against the insurer.").

The district court concluded the Special Hazards Endorsement was unambiguously an exclusion with exceptions, and applied what it viewed as a Massachusetts per se rule against finding an affirmative coverage obligation in an exception to an exclusion when, on the district court's reading, another provision unambiguously barred coverage.  Because we find the purpose and effect of the Special Hazards Endorsement to be ambiguous, we do not reach the question of whether such a per se rule exists under Massachusetts law.

    1. The plain text of the Special Hazards Endorsement is
       ambiguous.

The Special Hazards Endorsement is susceptible to at least three different interpretations.  Item 4 states, in part, that "coverage under this item 4: . . . [w]ill be available to bodily injury or property damage, but not damage to real property or to a body of water or to any other natural resource." (Emphasis added.)  This language does not appear in the preceding three

- 9 -

items.  One reading, adopted by PTI, is that this clause in item 4 makes explicit and qualifies a coverage guarantee in each of the four items.  On this view, each of the four items in the Special Hazards Endorsement guarantees coverage in the circumstances the item describes.  This guarantee is explicit only in item 4, because that is the only place where the agreement limits that guarantee (by excluding damage to real property, bodies of water, or other natural resources).  A second reading, which neither party advocates, is that this language creates a limited coverage guarantee only for item 4.  The narrowest reading, which General Star adopts, is that implicitly, this clause contains a limitation that the "[w]ill be available" language does not apply if an exclusion elsewhere in the agreement also applies.[2]  But this is not explicit anywhere in the Endorsement.  Both PTI's and General Star's interpretation of the Endorsement require an inferential step, and neither is ruled out by the text of the Endorsement.

---

[2]     General Star also argues PTI waived at summary judgment the argument that the Special Hazards Endorsement creates coverage.  This argument is meritless.  PTI and Utica plainly argued coverage was available because the Special Hazards Endorsement and its exceptions applied.  Indeed, at summary judgment General Star argued "PTI and Utica attempt to create coverage by pointing to . . . the Drilling Fluids Exclusion [in the Special Hazards Endorsement]."  This issue was thus fairly presented to the district court.  See La Plante v. Am. Honda Motor Co., Inc., 27 F.3d 731, 740 (1st Cir. 1994) (stating that an issue "timely and squarely presented to the district court" is not waived).

Other language in the Special Hazards Endorsement adds to the ambiguity.  The Endorsement is titled a "limitation" but later states "this exclusion . . . ."  And unusually for a policy exclusion, it appears to contain at least a limited affirmative guarantee of coverage in item 4.  We are required to assume "[e]very word in an insurance contract" was "employed with a purpose."  Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 844 (Mass. 2013) (quoting Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London, 871 N.E.2d 418, 425 (Mass. 2007)).  "Limitation" is not synonymous with "exclusion."  See Pinheiro v. Med. Malpractice Joint Underwriting Ass'n of Mass., 547 N.E.2d 49, 51–52 (Mass. 1989) ("The limitation straightforwardly promises to pay up to the policy limit for a single claim or multiple claims stemming from the 'injury' incurred by each 'person' as a result of the malpractice."); Radiology Res., Inc. v. Busfield, 494 N.E.2d 1370, 1372–73 (Mass. App. Ct. 1986) (holding that the limitation clause in the policy limited liability from losses of jewelry or precious metals or stones to $1,000 per incident).  Using both the terms "exclusion" and "limitation" in the Special Hazards Endorsement adds to the confusion about the purpose and effect of this provision (as does the very label of this endorsement as a limitation and not an exclusion).  See CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. Co., 962 F.2d 77, 88 (1st Cir. 1992).

And under Massachusetts law, provisions of an insurance agreement should be read in light of the purpose of the overall agreement. U.S. Liab. Ins. Co. v. Benchmark Constr. Servs., Inc., 797 F.3d 116, 122-23 (1st Cir. 2015). This was an excess liability policy for a company that shipped, among other things, petroleum products. Reading the agreement, as General Star does, to exclude a major risk in PTI's line of business is inconsistent with the purpose of this insurance policy.

In these circumstances, the plain text of the Special Hazards Endorsement is ambiguous. Nothing in the text of the Endorsement conclusively favors one interpretation over the others.

> 2. Other provisions in the policy do not resolve the ambiguity in the Special Hazards Endorsement.

Massachusetts instructs courts to read the text of an insurance policy as a whole and give meaning to each provision in context. See Holyoke Mut. Ins. Co., 106 N.E.3d at 577; LES Realty Trust "A" v. Landmark Am. Ins. Co., 977 N.E.2d 566, 569 (Mass. App. Ct. 2012) ("[W]ell-established principles of policy interpretation requir[e] that we consider policy provisions in context and in light of the policy as a whole.").

The text of this agreement as a whole does not provide any context that resolves the ambiguity in the meaning of the Special Hazards Endorsement. Rather, it uses clauses that might

have clarified the meaning of that provision inconsistently. For example, the Certified Acts of Terrorism Exclusion states "[t]he terms and limitations [of this exclusion] . . . do not serve to create coverage for 'any injury or damage' that is otherwise excluded under this Coverage Part." General Star did not include the same language in the Special Hazards Endorsement, or other endorsements, such as the Silica Exclusion, Asbestos Exclusion, or the Nuclear Waste Exclusion.

The agreement also labels the Special Hazards Endorsement a "limitation" whereas it calls the fifteen other endorsements that limit coverage "exclusions." As we have described, the Special Hazards Endorsement also uses the term "exclusion" in its text. It is unclear whether the use of a different title for the Special Hazards Endorsement is meaningful -- as it ordinarily would be -- or simply inadvertent. <u>See Endorsements, riders, and the like</u>, 2 Couch on Ins. § 21:21 (3d ed. 2020) ("The caption of a rider is to be read and construed with the language of the rider itself . . . .").

And there is substantial overlap between the Total Pollution Exclusion and the specific endorsements in the agreement. The Total Pollution Exclusion disclaims coverage for "any . . . [r]equest, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of

pollutants." It further defines pollutants to include "[a]ny solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." But the policy still contains specific exclusions for cleanup costs for pollutants that appear to meet that broad definition, including nuclear waste, bisphenol A, asbestos, and silica.[3] Massachusetts courts ordinarily read insurance agreements to avoid surplusage. See Desrosiers v. Royal Ins. Co. of Am., 468 N.E.2d 625, 629 (Mass. 1984). Once again, the extent to which the redundancy in this particular agreement is meaningful, or simply inadvertent, is unclear. For that reason, we cannot rely on the Total Pollution Exclusion to resolve the ambiguity in the text of the Special Hazards Endorsement.

In these circumstances, neither PTI's nor General Star's interpretation of the Special Hazards Endorsement is unreasonable. "[T]he phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations

---

[3] Massachusetts has cited approvingly case law calling silica a "pollutant." See Warner Co. v. Liberty Mut. Ins. Co., 951 N.E.2d 1013, at *5 (Mass. App. Ct. 2011) (unpublished table opinion). More generally, it has stated that a reasonable policyholder's expectations govern what constitutes pollution within the meaning of such a policy. See Feinberg v. Com. Union Ins. Co., 766 N.E.2d 888, 893 (Mass. App. Ct. 2002).

undertaken." <u>Surabian Realty Co.</u> v. <u>NGM Ins. Co.</u>, 971 N.E.2d 268, 271 (Mass. 2012) (internal quotations and citations omitted).

 3. <u>Ambiguity in the policy must be construed in favor of the insured.</u>

Massachusetts law is unequivocal that faced with two plausible interpretations of the policy, we must construe all ambiguity in favor of the insured.[4]  <u>Id.</u> at 271; <u>Metro. Prop. & Cas. Ins. Co.</u>, 951 N.E.2d at 671; <u>see also</u> <u>Utica Mut. Ins. Co.</u> v. <u>Weathermark Invs., Inc.</u>, 292 F.3d 77, 80 (1st Cir. 2002) ("[A]ny residual ambiguity must be resolved against the insurer.").  When faced with competing plausible interpretations of the insurance policy "doubts as to the intended meaning of the words must be resolved against the insurance company that employed them." <u>Surabian Realty Co.</u>, 971 N.E.2d at 271 (quoting <u>Boazova</u> v. <u>Safety Ins. Co.</u>, 968 N.E.2d 385, 390 (Mass. 2012)).  This is doubly so when construing a provision that limits available coverage.  <u>See</u>

---

 [4]   General Star argues that even if the policy is ambiguous, extrinsic evidence proves the Total Pollution Exclusion precludes coverage here.  It points to the fact that after this dispute arose PTI renegotiated its insurance coverage and paid an additional premium in exchange for a more limited Total Pollution Exclusion. This is unpersuasive.  At the district court the parties agreed this matter presented a pure question of law that could be resolved without discovery.  In any event, General Star has not met its burden to show the extrinsic evidence is "so one-sided" that no reasonable person could accept PTI and Utica's interpretation in light of that evidence.  <u>See</u> <u>Mason</u> v. <u>Telefunken Semiconductors Am., LLC</u>, 797 F.3d 33, 38 (1st Cir. 2015); <u>see also</u> <u>Utica Mut. Ins. Co.</u> v. <u>Weathermark Invs., Inc.</u>, 292 F.3d 77, 80 (1st Cir. 2002).

<u>Hakim</u>, 675 N.E.2d at 1165; <u>Vappi & Co., Inc.</u>, 204 N.E.2d at 276.
We conclude coverage is available to PTI and reverse.

    4. <u>PTI's unfair and deceptive insurance practices claims</u>
      <u>are meritless.</u>

      We see no basis in the evidence for PTI's claim of unfair
and deceptive insurance practices claims. General Star's
interpretation of the policy was not inherently unreasonable. <u>Cf</u>.
<u>N. Sec. Ins. Co.</u> v. <u>R.H. Realty Tr.</u>, 941 N.E.2d 688, 692 (Mass.
App. Ct. 2011) ("[A] good faith dispute as to whether money is
owed, or performance of some kind is due, is not the stuff of which
a . . . 93A claim is made.") (quoting <u>Duclersaint</u> v. <u>Fed. Nat'l
Mortg. Ass'n</u>, 696 N.E.2d 536, 540 (Mass. 1998)). And PTI waived
any arguments that it is entitled to judgment on the 93A claim
below by asserting "should this court decide the coverage issue in
the plaintiffs' favor, General Star is not entitled to [s]ummary
[j]udgment on the plaintiffs' 93A claim."

III.

      The judgment of summary judgment for General Star
Indemnity Company is reversed. Judgment should be entered on the
Massachusetts breach of contract claim for plaintiffs Performance
Trans., Inc. and Utica Mutual Insurance Company. The Mass. Gen.
Laws ch. 93A, § 11 claim is **dismissed** with prejudice. No costs
are awarded.